## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOINT STOCK COMPANY STATE
SAVINGS BANK OF UKRAINE
(also known as JSC OSCHADBANK),

12G Hospitalna St.,
Kyiv 01001
Ukraine

                Petitioner,

   v.

THE RUSSIAN FEDERATION,
The Ministry of Justice of the Russian
Federation represented by Mr. Konstantin
Chuychenko, Minister of Justice
Zhitnaya, 14
Moscow, 119991
Russian Federation

               Respondent.

Case No. _____

## PETITION TO CONFIRM
## FOREIGN ARBITRATION AWARD

Pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign

Arbitral Awards (the "**New York Convention**"), as codified by the Federal Arbitration Act

("**FAA**"), 9 U.S.C. §§ 201–208, Petitioner Joint Stock Company State Savings Bank of Ukraine

(JSC Oschadbank) ("**Oschadbank**" or "**Petitioner**") hereby moves for the confirmation of the

November 26, 2018 arbitral award (the "**Award**") entered in favor of Oschadbank and against

Respondent the Russian Federation (the "**Respondent**" or "**Russian Federation**") in an arbitration

proceeding conducted pursuant to the Arbitration Rules of The United Nations Commission on

International Trade Law, 1976 (the "**UNCITRAL Arbitration Rules**") and under the Agreement

between the Government of the Russian Federation and the Cabinet of Ministers of Ukraine on the Encouragement and Mutual Protection of Investments dated November 27, 1998 (the "**BIT**" or "**Treaty**").   The Award should be recognized and a money judgment should be entered in Petitioner's favor against the Russian Federation in the amount of the Award and for such other relief as the Court deems just and proper.

## INTRODUCTION

1.      This is an action under the New York Convention to confirm an arbitral award arising from events in the Crimean Peninsula that occurred in the first half of 2014, culminating in the purported accession (from the perspective of Russian law) of the Crimean Peninsula to the Russian Federation on March 21, 2014 (the "**Accession**")[1].   The underlying dispute arose from the Russian Federation's wrongful invasion and occupation of Crimea, which resulted in the closure of Petitioner's Crimean operation and the unlawful seizure of its business, assets and valuables.

2.      Oschadbank commenced an arbitration (the "**Arbitration**") under the BIT on January 20, 2016.   Despite having been notified of the claim and receiving all pleadings and correspondence at all stages of the Arbitration proceeding, the Russian Federation deliberately failed to participate in the Arbitration.   Following a hearing, the arbitral tribunal (the "**Tribunal**") rendered the Award in favor of Petitioner in which it determined that:

- Respondent breached the BIT, in particular, Article 5, paragraph 1 (expropriation) of the Agreement on the unlawful expropriation of the Petitioner's investments in the Crimean peninsula; and

- Respondent is obliged to pay damages of  $1,115,167,036.34 plus interest and costs of the proceeding.

---

[1]   From the perspective of both Ukraine and the international community, Crimea remains the sovereign territory of Ukraine.

3.      Petitioner now seeks to confirm this final and binding Award under the New York Convention.

## PARTIES

4.      Petitioner Oschadbank is a Joint Stock Company (formerly a Public Joint Stock Company) with its headquarters at 12G Hospitalna St., Kyiv 01001 Ukraine.  Oschadbank is one of the largest banks in Ukraine and, at the time of the events giving rise to this dispute, had 294 branches in the Crimean Peninsula.  Its 100% shareholder is the Ukrainian State, but it is an independent Ukrainian commercial entity.

5.      Oschadbank was the Claimant in the Arbitration proceeding administered by the Permanent Court of Arbitration ("**PCA**"), Case No. 2016-14, against Respondent, the Russian Federation.

6.      Respondent Russian Federation is a foreign state within the meaning of the Foreign Sovereign Immunities Act ("**FSIA**"), 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), and 1602–1611. The Russian Federation was named in the Arbitration proceeding as the Respondent.

## JURISDICTION AND VENUE

7.      This is a proceeding to recognize a foreign arbitral award governed by the New York Convention.  The Arbitration was seated, and the Award was rendered, in Paris, France. The Award, which was issued in English, is attached to the accompanying Declaration of Debra O'Gorman ("**O'Gorman Decl.**") as Exhibit A and is certified as a true and correct copy by the O'Gorman Decl.

8.      The Court has subject matter jurisdiction over this action pursuant to Section 202 of the FAA, which provides, in relevant part, that "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial,

including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention[;]" and Section 203, which provides that "[a]n action or proceeding falling under the [New York] Convention shall be deemed to arise under the laws and treaties of the United States;" and, consequently, under 28 U.S.C. § 1331.  The Award at issue arose out of Petitioner's investments in Crimea, a legal relationship that is commercial in nature, and therefore meets the criteria under the FAA.

9.     The Court also has subject matter jurisdiction over this action pursuant to Section 1605(a)(1) of the FSIA, which grants federal district courts subject matter jurisdiction over foreign states in cases "in which the foreign state has waived its immunity either explicitly or by implication[.]"   The Russian Federation has waived its immunity from suit under Section 1605(a)(1) by acceding to the New York Convention, and thus waiving immunity in relation to an action to enforce an award in the United States.  *See Tatneft v. Ukraine*, 771 F. App'x 9, 10 (D.C. Cir. 2019) (holding that "a sovereign, by signing the New York Convention, waives its immunity from arbitration-enforcement actions in other signatory states").  Further, the Russian Federation is not immune pursuant to Section 1605(a)(6)(B) because this is an action "to confirm an award made pursuant to … an agreement to arbitrate" and "the … award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards," namely the New York Convention.  *See Belize Bank Ltd. v. Gov't of Belize*, 191 F. Supp. 3d 26, 33 (D.D.C. 2016) ("The New York Convention is exactly the sort of treaty Congress intended to include in the arbitration exception [under 28 U.S.C. §1605(a)(6)]." (internal citations omitted)).

10.     This Court may exercise personal jurisdiction over Respondent pursuant to 28 U.S.C. § 1330(b).

11.     Venue is proper in this court under 9 U.S.C. § 204 and 28 U.S.C. § 1391(f)(4), which allows a civil action against "a foreign state" to be brought in the United States District Court for the District of Columbia.

## FACTUAL BACKGROUND

### I.     THE UNDERLYING INVESTMENT DISPUTE

#### A.     The Russian Federation-Ukraine BIT

12.     On November 27, 1998, the Cabinet of Ministers of Ukraine and the Government of the Russian Federation entered into an Agreement "on the encouragement and reciprocal protection of investments" known as a Bilateral Investment Treaty or BIT.  The BIT entered into force on January 27, 2000.  A certified English translation of the BIT is attached to the accompanying O'Gorman Decl. as Exhibit B and is certified as a true and correct copy by the O'Gorman Decl., at ¶¶ 1, 3.

13.     The express purpose of the BIT is to "encourage the investors of the other Contracting Party to make investments in its territory and shall admit such investments subject to its laws."  BIT, Art. 2.  The Treaty further provides "[e]ach Contracting Party shall guarantee in conformity with its laws the full and unconditional legal protection to investments of investors of the other Contracting Party."  *Id.*

14.     The BIT is applicable to "Investments" which is defined to include "all kinds of assets and intellectual values, which are invested by an investor of one Contracting Party in the territory of the other Contracting Party in conformity with its laws[.]"  *Id.*, Art. 1.  An "Investor of a Contracting Party" is defined to include "any legal entity, constituted under the law in force in the territory of that Contracting Party, provided, that the legal entity is competent under the laws of its Contracting Party to make investments in the territory of the other Contracting Party."  *Id.*

15.     Under Article 3(1) of the BIT, Russia undertook to extend "most favored nation treatment" and "provide in its territory to the investments made by investors of the other Contracting Party, and the activity associated with such investments treatment no less favorable, than the treatment, accorded to its own investors or investors of any third state, which precludes the application of discriminatory measures that could interfere with the management and disposal of the investments."  *Id.*, Art. 3(1).

16.     Importantly, Article 5 of the BIT protects against expropriation and provides that "[t]he investments of investors of one Contracting Party, made in the territory of the other Contracting Party, ***shall not be expropriated, nationalized or subjected to measures***, the effect of which is tantamount to expropriation (hereinafter referred to as - expropriation), with the exception of cases, when such measures are adopted in the public interest under due process of law, are not discriminatory and are accompanied by the payment of prompt, adequate and effective compensation."  *Id.*, Art. 5.

17.     The BIT also provides a mechanism for settling disputes between an investor and the state where it made its investment.  *See* BIT, Art. 9.  The BIT provides that a disagreement not settled through amicable negotiations or international conciliation may be referred to arbitration, and further lays out the procedures and requirements of such arbitration.  *See id.*, Art. 9(2).

18.     Pursuant to Article 9, the parties consented to arbitrate "[a]ny dispute between either Contracting Party and an investor of the other Contracting Party that arises in connection with the investments, including disputes, which concern the amount, terms of or procedure for payment of compensation, provided for in Article 5 hereof, or the procedure for effecting a transfer of payments, provided for in Article 7 hereof[.]"  *Id.*, Art. 9(1).

19.     Under the Treaty, "[t]he arbitral award shall be final and binding upon both parties to the dispute.  Each Contracting Party shall undertake to enforce such an award in conformity with its laws." *Id.*, Art. 9(3).

20.     Article 12 of the BIT entitled "Application of the Agreement" describes the scope of the Treaty's application and provides "[t]his Agreement shall apply to all investments, made by the investors of one Contracting Party in the territory of the other Contracting Party as of 1 January 1992." *Id.*, Art. 12.

21.     Oschadbank alleged in the Arbitration that the "Respondent breached several provisions of the [BIT], including (a) Article 2(2) guaranteeing unconditional legal protection; (b) Article 3(1) guaranteeing non-discriminatory treatment; (c) Article 3(1) guaranteeing most favored nation treatment; (d) Article 4 ensuring transparency and accessibility of legislation; (e) Article 5(1) preventing unlawful expropriation; (f) Article 7 ensuring free transferability of funds; and (g) protection against denial of justice."  Award ¶ 141.

**B.     Oschadbank's Crimean Investments and the Russian Federation's 2014 Invasion**

22.     Oschadbank is one of the largest Ukrainian banks and historically had a strong presence in the Crimean Peninsula.  It was created following the independence of Ukraine, when the activity of the Ukrainian branch of Sberbank of the former Soviet Union was transferred by the Ukrainian State to a public law company, initially called "*Specialized Commercial Public Savings Bank of Ukraine (Oschadbank of Ukraine)*", which was registered on December 31, 1991. It later became known as Oschadbank.  At the time of the events giving rise to the dispute from which the Award arose, Oschadbank had 294 branches in the Crimean Peninsula (the "**Crimean Branch**").  Award ¶ 63.  Prior to the Accession, Oschadbank conducted regular banking activities and provided a range of financial services in the Crimean Peninsula through its Crimean Branch.

*Id.* ¶ 65.   As explained below, Oschadbank's Crimean Branch was destroyed following the Accession as a result of the Respondent's actions, which were part of a "deliberate campaign to replace the Ukrainian banks in Crimea with Russian banks."   *Id.* ¶ 66.   Oschadbank's Crimean Branch was shut down in May 2014 and has not operated since.   *Id.*   Oschadbank has not regained control of its business and assets in the Crimean Peninsula, nor has it received any compensation for this expropriation.   *Id.* ¶¶ 312-15.

23.     In late February 2014, the Russian Federation invaded and occupied the Crimean Peninsula in violation of international law[2].   *Id.* ¶¶ 54, 258.   Several days after the military invasion, on March 16, 2014, the Crimean authorities held a referendum (the legitimacy of which was never recognized by Ukraine, independent observers, or the international community) on the question of Crimea's "reunification" with Russia.   Award ¶ 56.   The putative referendum was organized by pro-Russian local leaders in Crimea in close coordination with the Kremlin.   *Id.* ¶ 54-61.   The next day, on March 17, the so-called "Crimean authorities" (meaning the by then fully Russified local government of Crimea) adopted a resolution purporting to proclaim the independence of Crimea and announcing a request for accession to Russia.   *Id.* ¶ 58.   Then, on March 18, 2014, the so-called Crimean authorities signed a "Treaty on the Accession of the Republic of Crimea in the Russian Federation and on Creation of New Constituent Entities within the Russian Federation" endorsing the purported accession of Crimea to the Russian Federation (the "**Accession Treaty**").   *Id.* ¶ 59.   On March 21, 2014, the Russian Federation adopted both a

---

[2] The Tribunal declined to comment on the legality of the Russian Federation's invasion of Ukraine, noting that it was "not necessary to make a finding on…the legality of the actions of the Respondent otherwise than in relation to the Claimant during the relevant time."  Award ¶ 190. In 2014, however, the United Nations General Assembly passed a resolution declaring the secession invalid and calling for an end to "any attempts to modify Ukraine's borders through the threat or use of force or other unlawful means".  *See* Territorial integrity of Ukraine, G.A. Res. 68/262, U.N. Doc. A/RES/68/262 (Mar. 27, 2014).

federal law ratifying the Accession Treaty, and a "federal constitutional law providing for the acceptance of the Republic of Crimea and Sevastopol as new subjects of the Russian Federation[.]" *Id.* ¶ 61.  As of that date, the Republic of Crimea became a constituent entity of the Russian Federation from the perspective of Russian law.  This treaty also provided for the immediate application of Russian law in Crimea.  Award ¶ 61.

24.     Thereafter, the Russian Federation adopted a series of draconian laws that made it impossible for Ukrainian Banks like Oschadbank to comply and lawfully operate in Crimea.  *Id.* ¶¶ 69-71.  One such law provided for the creation of a body called the "depositor protection fund" (the "**DPF**") which purported to have authority to recover the sums paid to depositors from Ukrainian banks.  *Id.* ¶ 70.  After Oschadbank was unable to meet the arbitrary and impossible demands of these new laws, the DPF obtained authorization to manage the assets of Oschadbank and other Ukrainian banks operating in Crimea.  *Id.* ¶¶ 85-88.  The DPF then leased the movable and immovable assets of these Ukrainian banks, mainly to two Russian Federation banks, Russian Federation National Commercial Bank (RNCB) and GenBank.  *Id.* ¶¶ 149, 151, 302, 309.  During April 2014, 85 of Oschadbank's branches in Crimea were forced to close due to the termination of leases on their premises without notice.  *Id.* ¶ 75.

25.     Other unlawful measures were taken against the employees and assets of Oschadbank's Crimean Branch.  In April 2014, the so-called Crimean authorities published a list of individuals whose presence was declared undesirable in the territory of Crimea.  Among those named was Andriyy Pyshnyy, the Chairman and CEO of Oschadbank.  Award ¶ 74.  In April-May 2014, Oleg Riabtsev, the then Head of the Crimean Branch, was threatened with criminal prosecution if the Crimean Branch's assets were moved to mainland Ukraine or if he ignored the requests to hand over cash and valuables.  *Id.*

26.     Russia's wrongful acts continued.  On May 16 and 21, 2014, representatives of the so-called Crimean authorities and the so-called Crimean self-defense forces (Russian Federation paramilitary units) seized valuables from Oschadbank's Crimean Branch's headquarters in Simferopol.  *Id.* ¶ 76.  Oschadbank was also thwarted in its efforts to safeguard cash, valuables and sensitive customer information from its Crimean Branch by removing it to mainland Ukraine for safekeeping.  *Id.* ¶ 78.  On most occasions, such transfers were unsuccessful due to the fortified checkpoints at the border between the Crimean Peninsula and mainland Ukraine, and threats to Oschadbank employees from the so-called Crimean self-defense forces.  *Id.*

27.     Finally, on May 26, 2014, the Central Bank of the Russian Federation, purporting to exercise the powers granted to it by the Russian Federation Law on the Banking System, ordered Oschadbank to stop its activities in Crimea and appointed a representative of the Central Bank of the Russian Federation to administer the assets of Oschadbank in Crimea.  *Id.* ¶ 81.

28.     Oschadbank was never able to regain possession of its business, operations and assets in Crimea and did not receive any compensation for this expropriation.  Award ¶ 314.

## II.     THE ARBITRATION

29.     Under Article 9 of the BIT, a dispute may be referred to arbitration if it is unable to be settled amicably through negotiation or international conciliation.  BIT, Art. 9.

30.     By letters dated July 8, 2015, and October 8, 2015, Oschadbank notified the Russian Federation of the existence of a dispute between them.  *Id.* ¶ 8.

31.     By letter dated December 24, 2015, the Russian Federation replied that, in its view, the BIT cannot apply to the dispute.  *Id.* ¶ 9.  Thus, efforts to resolve the dispute amicably were not successful.

32.     Because its property and activities in Crimea qualify as protected investments under Article 1(1) of the Treaty, Petitioner initiated the Arbitration on January 20, 2016, by filing a

request for arbitration on the basis of Article 9(2)(c) of the BIT.  *Id.* ¶ 10.  The PCA was designated to act as case registry and to provide administrative support to the Tribunal.  *Id.* ¶ 25.  The Arbitration proceedings were to be conducted in accordance with the UNCITRAL Arbitration Rules, applicable at the date of signature of the treaty, which corresponds to the version adopted in 1976.  *Id.* ¶ 10.

33.     Despite having been properly notified, the Russian Federation refused to participate in the Arbitration proceedings.  *See* Award. ¶ 3.  It did not appoint an arbitrator within the time limit set by the UNCITRAL Arbitration Rules.  *Id.* ¶ 12.  On February 23, 2016, the PCA invited the Russian Federation to submit its comments on Oschadbank's request for the appointment of the second arbitrator pursuant to Article 7(2)(b) of the UNCITRAL Rules.  *Id.* ¶ 13.  The Russian Federation did not respond to this invitation.  *Id.*  As a result, the Tribunal was constituted in accordance with the procedure provided for under the UNCITRAL Arbitration Rules in case of default by one of the parties.  *Id.* ¶ 16.

34.     Then, on May 19, 2016, the Tribunal transmitted to both parties a draft of Terms of Reference and a first Procedural Order, inviting them to provide their comments.  Award ¶ 17. The Russian Federation did not respond to this invitation.  *Id*.

35.     The Russian Federation did, however, transmit a letter to the PCA via its Ambassador to the Kingdom of the Netherlands, dated June 21, 2016.  *Id.* ¶¶ 18-20.  Attached to this letter were letters dated May 13, 2016 and December 24, 2015, respectively, that had been sent to Petitioner, by which the Russian Federation contested the Tribunal's jurisdiction and the applicability of the BIT to the dispute.  *Id.*  The May 13 letter explains:

> According to Clause 1 of Article 1 of the Agreement, the term "investments" means all kinds of assets and intellectual values, which are invested by an investor of one Contracting Party in the territory of the other Contracting Party in conformity with its laws.

> The assets being the subject of dispute are located in the territory of the Republic of Crimea and the city of Sevastopol which were earlier part of Ukraine. The Bank's assets do not constitute investments, since they were not invested in the territory of the Russian Federation, and, even if they occurred, they were made before accession of the Republic of Crimea and the city of Sevastopol to the Russian Federation and not in conformity with the legislation of the Russian Federation. These assets have not been earlier subject to taxation under the legislation of the Russian Federation and have not contributed to the development of the economy of the Russian Federation.
>
> On the basis of the abovementioned the Russian Federation does not recognize the jurisdiction of an international tribunal at the Permanent Court of Arbitration in settlement of the abovementioned claim.

*Id*. ¶ 20.

36.     The Russian Federation refused to participate in the first procedural conference, which was held by telephone on July 26, 2016.  *Id.* ¶ 26.  It did not otherwise elaborate on the objections it had raised in its prior letters.

37.     On August 26, 2016, Petitioner submitted its Statement of Claim in the Arbitration pursuant to the timetable established in Procedural Order No. 1.  Award ¶ 28.  In its Statement of Claim, Petitioner requested, among other things, an award confirming that the Tribunal has jurisdiction and a declaration that the Russian Federation had breached several provisions of the BIT, including Article 5(1) on expropriation, and for monetary compensation based on the value that the Oschadbank expected to derive from its Crimean investments, plus interest and the costs of the arbitration.  *Id.* ¶¶ 164, 180.

38.     The Russian Federation failed to provide a statement of defense or any formal objection to jurisdiction or admissibility.  *Id.* ¶ 31.  As mentioned above, the Russian Federation preferred to raise its objections to jurisdiction by correspondence.  It also failed to participate in the final hearing, which took place from March 27 to 29, 2017 in Paris, France.  Award ¶¶ 43-44.

39.     Despite its deliberate non-participation, the Russian Federation continued to receive all correspondence, pleadings, and any other materials relating to the Arbitration, both electronically and in hard copy (with return receipt) throughout the proceedings, and never raised an allegation that it was not properly notified of the proceedings.  *Id.* ¶¶ 192, 194, 195.

## III.   THE ARBITRAL AWARD

40.     Following the hearing, the Tribunal rendered its 120-page, unanimous final Award on November 26, 2018.

41.     On jurisdiction, the Tribunal concluded that is "has jurisdiction to determine the present dispute." *Id.* ¶ 410.  This finding was based on a determination "for all the reasons set out above, that the Crimean Peninsula falls within the territory of the Respondent for the purposes of the Treaty." *Id.* ¶ 218.

42.     On the question of whether Oschadbank's business activities qualified as an "investment" under the BIT, the Tribunal acknowledged that "Respondent's primary objection to the jurisdiction of this Tribunal appears, from its limited correspondence, to be that there is no "investment" of the Claimant in the Respondent's territory within the meaning of Article 1(1) of the Treaty." *Id.* ¶ 220.  In finding that the activities qualified as an investment, the Tribunal concluded "it is immaterial for the purposes of determining jurisdiction that the investments were made before the accession of the Crimean Peninsula to the Respondent." *Id.* ¶ 226.  In this regard, the Tribunal also found that "operations of the Claimant in the region at the time the Crimean Peninsula became part of the territory of the Respondent conformed with the Respondent's legislation for the purposes of Articles 1(1) and 2(1) of the Treaty."  Award ¶ 229.  The Tribunal went on to conclude that "a qualifying investment existed under Article 1(1) of the Treaty." *Id.* ¶ 235.

43.     Based on the conclusion that an investment existed, the Tribunal determined "there remains no credible objection to the Claimant being defined as an investor under the Treaty" and found that it had jurisdiction under the Treaty to determine the dispute in relation to the Claimant's investments in the Crimean Peninsula.  *Id.* ¶¶ 236, 239.

44.     The Tribunal also found that the actions of the so-called Crimean self-defense forces were attributable to the Russian Federation because they were "under the instruction, direction or control of the Crimean authorities at all material times after 11 March 2014.  Accordingly, the Tribunal finds that the responsibility of the Crimean Self-Defense Forces were attributable to the Respondent."  Award ¶ 278.

45.     The Tribunal then went on to make its finding on liability.  It determined that it was "satisfied that the Claimant has established that the measures have had an effect tantamount to expropriation of the totality of Claimant's investment in the Crimean Peninsula."  *Id.* ¶ 310.  It then concluded "that the Respondent has engaged in wrongful expropriation.  It follows that the Respondent stands in breach of its obligations under Article 5(1) of the Treaty.  Accordingly, having considered all relevant matters extensively, the Tribunal finds that the Respondent's liability under international law for a breach of the Treaty has been established."  *Id.* ¶ 321.

46.     With respect to damages, the Tribunal found "that the Claimant is entitled to recover, and the Respondent is obliged to pay, the sum of USD 1,111,300,729 as compensation for the losses suffered by the Claimant as a result of the Respondent's various breaches of the Treaty."  *Id.* ¶ 375.  It also awarded "pre- and post-Award interest at the average (calculated for the period between the date of valuation, 31 March 2014, and the date of this Award) Six-Month USD LIBOR rate, plus 2%."  Award ¶¶ 390, 410.

47.     Finally, the Award included costs of $3,134,907.34 in respect of Petitioner's legal fees and expert fees and related expenses, as well $731,400.00 for the costs and expenses of the arbitration.  *Id.* ¶ 409, ¶ 410.

## IV.     THE ANNULMENT PROCEEDINGS

48.     Despite its non-participation in the Arbitration, the Russian Federation sought to annul the Award by filing an action to set aside the Award before the Paris Court of Appeal on February 19, 2019.  A certified English translation of the subsequent March 30, 2021 decision by the Paris Court of Appeal, Case No. 23/2021, is annexed to the O'Gorman Decl. as Exhibit C (the "**Court of Appeal Decision**").  The Russian Federation argued that the Tribunal had wrongly upheld its jurisdiction, that Oschadbank had committed "procedural fraud" such that the Award infringed the requirements of international public policy, and that the Tribunal had ruled without complying with the mandate conferred upon it.  Court of Appeal Decision, Sect. III, ¶ 30.

49.     In support of its claim that the Tribunal lacked jurisdiction, the Russian Federation argued, among other things, that the BIT imposed temporal restrictions on the Tribunal's jurisdiction and that it was not applicable to the dispute because the "original investment" had been made before the January 1, 1992, which was the effective date of the BIT.  *Id.*, Sect. III, ¶¶ 25, 27, 30.  The Russian Federation argued, on the basis of supposed "newly discovered evidence" (which Oschadbank supposedly "concealed" from the Tribunal), that the Crimean Branch was established before January 1, 1992 and that the arbitration agreement of the BIT only applied to investments made on or after that date.  *Id.*

50.     Oschadbank argued in response that its investments had been located "in the territory" of the Russian Federation, within the meaning of Article 1.4 of the BIT, only since the invasion in March 2014, when the Russian Federation established effective control over the Peninsula.  *Id.*, Sect. III, ¶ 43.  Oschadbank also asserted that the jurisdictional objection was

inadmissible because it had not been raised before the Tribunal, and that in any event, the requirement that the BIT applied to investments made on or after January 1, 1992 did not go to the jurisdiction of the Tribunal but to the scope of substantive protection of the BIT.  *Id.*, Sect. III, ¶¶ 44, 47.  As such, Oschadbank's position was that this was a substantive issue on the merits of the case and was not reviewable in an action to set aside in France.  *Id.*, Sect. III, ¶ 49.  Oschadbank also clarified that the so-called "newly discovered evidence" referenced by the Russian Federation actually had been disclosed with Oschadbank's own submissions to the Tribunal.  Court of Appeal Decision, Sect. III, ¶¶ 60-61.

51.     The Paris Court of Appeal rejected Oschadbank's claim of inadmissibility of the Russian Federation's jurisdictional objection, took the view that Article 12 of the BIT affected the jurisdiction of the Tribunal and annulled the Award for lack of jurisdiction of the Tribunal.  *Id.*, Sect. V, ¶¶ 1-2.

52.     The Court of Appeal found that the Russian Federation's letter sent at the outset of the Arbitration was sufficient to raise the jurisdictional objection.  *Id.*, Sect. IV, ¶¶ 66-69.  On the merits, the Court of Appeal concluded "that the temporal condition laid down in Article 12 of the Bilateral Investment Treaty containing the offer of arbitration has not been satisfied, so the Arbitration Tribunal has wrongly declared itself competent to hear the dispute."  *Id.* Sect. IV, ¶ 101.  This finding was based on the fact that the effective date of the BIT is January 1, 1992, and "Oschadbank's banking activity in Crimea had begun earlier—which necessarily implies that the investment was made earlier."  *Id.*, Sect. IV, ¶ 100.  It then concluded "[i]t is, therefore, appropriate to annul the award without the need to consider the other grounds."  *Id.*, Section IV, ¶ 102.

53.     As of the date of the Court of Appeal Decision, the Award was set aside.

54.     Petitioner then challenged the Court of Appeal Decision before the French *Cour de Cassation*, the highest appellate court in France.  In a December 7, 2022 decision issued in *Oschadbank v Russian Federation*, French *Cour de Cassation*, No. 21-15.390, the French court set aside the Court of Appeal Decision annulling the Award.  It held that the Court of Appeal had improperly found that the offer of arbitration and the definition of investment contained in the BIT included a temporal restriction.  A certified English translation of the decision of the French *Cour de Cassation* is annexed to the O'Gorman Decl. as Exhibit D ("***Cour de Cassation* Decision**").

55.     The *Cour de Cassation* held that Paris Court of Appeal erred in finding that Article 12 of the Treaty imposed temporal restrictions on the Tribunal's jurisdiction—ruling that Article 12 of the Treaty was "*substantive*" in nature instead, such that its temporal restrictions did not affect the Tribunal's jurisdiction.  It therefore "SETS ASIDE AND ANNULS the judgment of the Paris Court of Appeal of March 30, 2021, except for the part in which it rejects the request by the Joint Stock Company 'State Savings Bank of Ukraine' to dismiss the ground based on the Arbitration Tribunal's lack of jurisdiction by reason of time."  *Id.*

56.     By virtue of the December 7, 2022 decision of the *Cour de Cassation*, the Award was reinstated in full and the matter was remanded to the Paris Court of Appeal.  *Id.*

## V.     ONGOING PROCEEDINGS BEFORE THE TRIBUNAL

57.     In addition to its application to revise the Award before the Paris Court of Appeal, Respondent relied on the same "newly discovered evidence" to make a "revision application" to the Tribunal in August 2019.  Respondent argued that it had new evidence to show that Oschadbank made its investments in Crimea before January 1, 1992, which, Respondent claimed, brought Oschadbank's claim outside the Tribunal's temporal jurisdiction.  Recognizing that the Respondent's revision application was based on legal arguments which were before the French courts, the Tribunal stayed the revision application pending the final ruling of those courts.

58.     On December 20, 2022, Petitioner wrote to the Tribunal requesting the immediate dismissal of the Respondent's revision application given the French *Cour de Cassation*'s final ruling on December 7, 2022 that the Respondent's jurisdictional objection was meritless.   The Russian Federation opposed and asked the Tribunal to continue the stay given that the proceedings had been remanded to the Paris Court of Appeal (with a different composition) or hold a full hearing on the merits of its application.

59.     The Tribunal is now expected to rule on the parties' applications in the context of the revision proceedings.

## REQUEST FOR THE RECOGNITION AND CONFIRMATION OF THE AWARD

60.     Petitioner repeats and re-alleges paragraphs 1 through 59.

61.     The parties' agreement to arbitrate is found in Article 9 of the BIT, which constitutes a valid "agreement in writing" for purposes of Article II of the New York Convention.

62.     The Award was made in France, a party to the New York Convention.  The Russian Federation, Ukraine, and the United States are also parties to the New York Convention.  *See* New York Convention, Art. I.

63.     The Award arose from a legal relationship between Petitioner and Respondent that is commercial within the meaning of Section 202 of the FAA, and the relationship is not "entirely between citizens of the United States."

64.     The Award is final and binding within the meaning of the New York Convention and Section 207 of the FAA and is therefore binding on the parties and subject to recognition and enforcement in the United States pursuant to the New York Convention and the FAA.

65.     The Award is final pursuant to Article 9 of the BIT which provides that "[t]he award of arbitration shall be final and binding upon both parties to the dispute. Each Contracting Party

shall undertake to execute such an award in conformity with its respective legislation."  The Award is also final pursuant Article 34 of the UNCITRAL Arbitration Rules, which provides that "[a]ll awards shall be made in writing and shall be final and binding on the parties."

66.     The FAA and the New York Convention make recognition and enforcement mandatory except where any of certain narrow defenses are proven.  *See* New York Convention, Arts. III & V; 9 U.S.C. § 207 (the "court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention"); *see also Thai-Law Lignite (Thailand) Co., Ltd. v. Gov't of Law People's Democratic Republic*, 864 F.3d 172, 178–179 (2d Cir. 2017).  None of the defenses to the enforcement of an arbitral award is applicable here.

67.     None of the grounds for "refusal or deferral of recognition or enforcement" of the Award under Article V of the New York Convention is applicable here.

68.     This petition is timely because it is filed within three years after the issuance of the Award, taking into account applicable tolling periods.  *See* 9 U.S.C. § 207.  "[L]imitations periods are customarily subject to equitable tolling unless tolling would be inconsistent with the text of the relevant statute."  *Young v. United States*, 535 U.S. 43, 49 (2002) (internal citations and quotation marks omitted).  A petitioner is entitled to equitable tolling "if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way and prevented timely filing."  *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005).  Courts apply this standard when considering requests for equitable tolling in the context of the enforcement of arbitration awards against foreign sovereigns.  *BCB Holdings Ltd. v. Gov't of Belize*, 110 F. Supp. 3d 233, 245 (D.D.C. 2015) (granting plaintiffs

equitable tolling of limitations period under the *Holland* test), *aff'd*, 650 F. App'x 17 (D.C. Cir. 2016), and enforcement granted, 232 F. Supp. 3d 28 (D.D.C. 2017).

69.     Petitioner is entitled to rely on equitable tolling in light of the extraordinary circumstances resulting from wartime conditions between Ukraine and the Russian Federation, which continue to this day.  Petitioner is further entitled to rely on equitable tolling because of the unprecedented and continuing COVID-19 global pandemic resulting in a prolonged period of quarantine in Ukraine (which has been officially extended through April 30, 2023) and the severe disruption of the Oschadbank's regular operations, which made it impossible to obtain all of the necessary advice, approvals and appropriations necessary to commence US litigation.[3]

70.     In addition, tolling is appropriate because, at all relevant times, Petitioner has been reasonably diligent in pursuing its rights and extraordinary circumstances prevented it from filing the Petition in a timely manner.  Petitioner commenced arbitration in January 2016, and has been pursuing its rights to compensation continuously ever since.  The Award was set aside by the Paris Court of Appeal in 2021, a finding that was reversed by the French *Cour de Cassation* just three months ago in December 2022.

71.     Petitioner is thus entitled to immediate confirmation, recognition and enforcement of the Award pursuant to Section 907 of the FAA and Article III of the New York Convention,

---

[3]  Various courts have considered whether emergency circumstances imposed by COVID-19 warranted equitable tolling.  These courts have concluded that a specific explanation of how COVID-19 prevented them from bringing suit within the normal limitation period could satisfy the standard. *See, e.g.*, *Gardner v. Erie Ins. Co.*, No. 22-CV-1977 RC, 2022 WL 16713035, at *4 (D.D.C. Nov. 4, 2022) (ruling that COVID-19 does not automatically create unusual circumstances warranting tolling without an explanation of how, specifically, the pandemic delayed petitioner's ability to bring suit); *Mack v. Alves*, 588 F. Supp. 3d 150, 152 (D. Mass. 2022) (same); *Murchison v. United States*, No. 2:13-CR-00193 GZS, 2021 WL 1082532, at *2 (D. Me. Mar. 18, 2021) (same), report and recommendation adopted, No. 2:13-CR-00193 GZS, 2021 WL 1583078 (D. Me. Apr. 22, 2021); *Clemente v. Allstate Ins. Co.*, No. 2:22-CV-00056 CCW, 2022 WL 17976324, at *13 (W.D. Pa. Dec. 28, 2022) (same).

and entry of judgment in favor of Petitioner and against Respondent in the full amount of the Award, with interest and costs as provided therein accruing through the date of this Court's judgment.

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully requests that this Court, pursuant to Article III of the New York Convention and Section 207 of the FAA:

a)  Enter an order recognizing and confirming the Award;

b)  Enter judgment for Petitioner and against Respondent in an amount equal to the full amount of damages and interest under the Award, as follows:

    1.  $1,115,167,036.34 along with the interest accrued starting from March 31, 2014 till the Award date, calculated on a compound basis, based on the six-month USD LIBOR rate plus 2% p.a., as well as the interest accrued from the Award date till the date of actual payment, calculated based on the six-month USD LIBOR rate plus 2% p.a.

    2.  $731,400.00 constituting the costs of the arbitration proceedings, including the administrative costs of the Permanent Court of Arbitration and the fees and expenses of the Members of the Tribunal;

    3.  legal fees, the fees of expert witnesses, and related expenses in a total amount of $3,134,907.34;

    4.  pre-Award interest on the amounts awarded on the damages award from March 31, 2014 until November 26, 2018, at the average (calculated for the period between the date of valuation, March 31, 2014, and the date of this Award) Six-Month USD LIBOR rate, plus 2%, compounded annually;

    5.  post-Award interest on all of the amounts awarded from November 26, 2018 until the Award has been paid in full, at the average (calculated for the period between the date of valuation, March 31, 2014, and the date of this Award) Six-Month USD LIBOR rate, plus 2%, compounded annually;

c)  Direct that post-judgment interest shall accrue at a rate of the six-month USD LIBOR rate plus 2% p.a. compounded semiannually starting on the date of the entry of judgment;

d)  Grant attorney's fees and costs in relation to the instant confirmation proceeding;

e)  Grant such other relief as the Court may deem just and proper.

Dated:  March 21, 2023

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By:_____
Dennis H. Hranitzky, D.C. Bar No. NY0117
2755 E. Cottonwood Parkway, Suite 430
Salt Lake City, Utah 84121
Tel: 801-515-7300
Fax: 801-515-7400

Debra O'Gorman, D.C. Bar No. NY0499
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel: 212-849-7000
Fax: 212-849-7100

*Counsel for Petitioner Joint Stock Company State
Savings Bank of Ukraine (JSC Oschadbank)*