# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Joint Stock Company State Savings Bank of Ukraine (a/k/a JSC Oschadbank), <br><br>           Petitioner, <br><br>     v. <br><br> The Russian Federation, <br><br>           Respondent. | CIVIL ACTION <br><br> NO. 1:23-cv-00764 (ACR) |

**REPLY IN SUPPORT OF RESPONDENT RUSSIAN FEDERATION'S SUPPLEMENTAL MOTION TO DISMISS THE PETITION TO CONFIRM AN ARBITRATION AWARD OF JOINT STOCK COMPANY STATE SAVINGS BANK OSCHADBANK AND RESPONSE TO DISCUSSION OF CASES DECIDED AFTER THE STAY WAS IMPOSED**

Bruce S. Marks (Bar I.D. C0034)
Thomas Sullivan (Bar I.D. PA0122)
Maria Grechishkina (Bar I.D. PA0199)
Marks & Sokolov, LLC
1835 Market St., 17th floor
Philadelphia, PA 19103
Tel: (215) 569-8901
marks@mslegal.com
tsullivan@mslegal.com
mgrechishkina@mslegal.com

*Counsel for Respondent,*
*The Russian Federation*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................. 1

ARGUMENT ................................................................. 2

THIS COURT LACKS JURISDICTION UNDER §1605(a)(6) ................... 2

I.   THERE WAS NO AGREEMENT TO ARBITRATE EXPROPRIATION CLAIMS UNDER THE BIT IN THE THEATER OF AN ARMED CONFLICT IN CRIMEA ................................................... 2

    A.   Russia's Argument Is Jurisdictional Because No Legally Valid Agreement Exists To Arbitrate Takings In Crimea Under Article 5(1) (Opp. 8-17) ..................................................... 2

        1.   No Legally Valid Agreement Exists To Arbitrate Takings In Crimea Because The BIT Is Superseded By The Law Of IAC, As *Lex Specialis* (Opp. 8-9) ................................ 3

        2.   *Helmerich* Establishes That This Court Must Determine A Legally Valid Claim Under FSIA As A Jurisdictional Issue (Opp. 7, 9) ....................................................... 4

        3.   Application Of The Law Of IAC Is Irrelevant To Scope Under *NextEra, Chevron* and *Stileks* (Opp. 10-12) .................. 5

        4.   Determination Of The Validity Of The BIT Is Jurisdictional Under *Hulley* (Opp. 12-13) ...................................... 7

        5.   The Law Of IAC Superseded, Not Suspended, The International Law Of Expropriation And BIT In Crimea (Opp. 14-15) ..................................................... 7

        6.   Oschadbank's Purported "Policy" Arguments Are Wrong and Irrelevant (Opp. 15-17) ...................................... 8

    B.   There Is No Agreement To Arbitrate Because The Law Of IAC Supersedes The BIT In Crimea As *Lex Specialis* (Opp. 17-23) ........................... 10

        1.   Russia Argued The BIT Was Superseded By The Law Of IAC In Crimea, Not That The BIT Was Suspended (Opp. 17-21) ........................................................ 11

        2.   The Law Of IAC As *Lex Specialis* Supersedes The International Law Of Expropriation And Investment Treaties (Opp. 21-23) ............................................. 13

i

    C.    Russia And Ukraine Did Not Agree To Arbitrate Takings During an IAC Between Them Under The BIT, Including Article 5 (Opp. 23-26) ....................................................................................................... 16

II.   THE NY CONVENTION DOES NOT APPLY BECAUSE THE AWARD DID NOT ARISE OUT OF A COMMERCIAL LEGAL RELATIONSHIP (Opp. 26-28) ......................................................................................... 19

    A.    This Court Must Determine If The New York Convention Applies As A Jurisdictional Issue (Opp. 26-27) ................................................. 19

    B.    Oschadbank's Allegations, And Ukraine's Positions Establish There Is No Commercial Legal Relationship Under The Law Of  IAC (Opp. 27-28) ................................................................................ 20

III.  THE 2025 FRENCH COURT OF APPEALS DECISION IS NOT COLLATERAL ESTOPPEL ON FSIA JURISDICTION  (Opp. 4-8) ................................ 22

    A.    Issue Preclusion Based On Foreign Judgments Does Not Apply To §1605(a)(6) Jurisdiction (Opp. 4) .......................................................... 22

    B.    *Hilton* Comity Counsels Against Recognizing The French Decision (Opp. 6-7) ...................................................................................... 25

    C.    Oschadbank Fails to Establish The French Law Of Collateral Estoppel .................................................................................................... 27

    D.    French Law Has No Issue Preclusion Effect Applicable To This Case ......................................................................................................... 28

    E.    Preclusion Does Not Apply Because the Issues Are Different Under FSIA and French Law (Opp. 4-8) .......................................................... 29

CONCLUSION.................................................................................................................. 30

## Table of Authorities

**Cases**

*Aenergy, S.A. v. Republic of Angola,*
   123 F.4th 1351 (D.C. Cir. 2024) ..................................................................27, 29, 30

*Alfa Consult SA v. TCI Int'l, Inc.,*
   2023 U.S. Dist. LEXIS 178309 (N.D. Cal. 2023) ...................................................27

*Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp.,*
   143 F.4th 496 (D.C. Cir. 2025) ................................................................................25

*Baker v. Carr,*
   369 U.S. 186 (1962) ..................................................................................................9

*Banco Nacional De Cuba v. Sabbatino,*
   376 U.S. 398 (1964) ................................................................................................26

*Bata v. Bata,*
   163 A.2d 493 (Del. 1960) ........................................................................................27

*Biton v. Palestinian Interim Self-Government Auth.,*
   412 F.Supp.2d 1 (D.D.C. 2005) ..............................................................................23

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.,*
   581 U.S. 170 (2017) ..............................................................2, 3, 4, 5, 8, 9, 19, 23

*Brown v. United States,*
   12 U.S. 110 (1814) ..............................................................................................9, 14

*Chevron Corp. v. Ecuador,*
   795 F.3d 200 (D.C. Cir. 2015) ..........................................................4, 5, 6, 19, 22

*Chum Ltd. v. Lisowski,*
   2001 U.S. Dist. LEXIS 2462 (S.D.N.Y. Mar. 12, 2001) ........................................30

*Clark v. Allen,*
   331 U.S. 503 (1947) ..........................................................................................11, 12

*de Csepel v. Republic of Hungary,*
   752 F.Supp.3d 147 (D. D.C. 2024) ......................................3, 4, 6, 15, 21, 29

*Cuno, Inc. v. Pall Corp.,*
   729 F.Supp. 234 (E.D.N.Y. 1989) ..........................................................................30

*Customs & Tax Consultancy LLC v. Democratic Republic of the Congo,*
   2019 WL 4602143 (D.D.C. Sep. 16, 2019) ............................................................4

*Diag Human v. Czech Rep. - Ministry of Health,*
   824 F.3d 131 (D.C. Cir. 2016) ................................................................................20

*Doe v. United States*,
  95 Fed. Cl. 546 (2010) ........................................................................................10

*El-Shifa Pharm. Indus. Co. v. United States*,
  378 F.3d 1346 (Fed. Cir. 2004) ...........................................................................9

*El-Shifa Pharm. Indus. Co. v. United States*,
  607 F.3d 836 (D.C. Cir. 2010) ..........................................................................9, 13

*Estate of Botvin v. Islamic Republic of Iran*,
  772 F.Supp.2d 218 (D.D.C. 2011) ...................................................................27–28

*Ex parte Quirin*,
  317 U.S. 1 (1942) ...............................................................................................14

*Ex parte Zenzo Arakawa*,
  79 F.Supp. 468 (E.D. Pa. 1947) ..........................................................................12

*Firebird Global Master Fund II Ltd. v. Republic of Nauru*,
  915 F.Supp.2d 124 (D.D.C. 2013) ..................................................................24–25

*F.R.G. v. Philipp*,
  141 S. Ct. 703 (2021)........................................................................................4, 21

*Gordon and Breach Science Publishers S.A. v. Am. Institute of Physics*,
  905 F. Supp. 169 (S.D.N.Y. 1995) .......................................................................27

*Gupta v. Thai Airways Int'l, Ltd.*,
  487 F.3d 759 (9th Cir. 2007) ..............................................................................23

*Hilton v. Guyot*,
  159 U.S. 113 (1895) .......................................................................................25, 26

*Hulley Enters. v. Russian Fed'n*,
  149 F.4th 682 (D.C. Cir. 2025) ..................................................1, 3, 7, 14, 22, 25

*Jack Faucett Assocs., Inc. v. AT&T*,
  744 F.2d 118 (D.C. Cir. 1984) ............................................................................23

*Juragua Iron Co. v. United States*,
  212 U.S. 297 (1909) ..........................................................................14, 15, 21, 29

*Ins. Corp. of Ir. v. Compagnie Des Bauxites De Guinee*,
  456 U.S. 694 (1982).............................................................................................30

*Karnuth v. U.S.*,
  279 U.S. 231 (1929) .....................................................................................8, 11, 12

*Laker Airways, Ltd. v. Sabena, Belgian World Airlines*,
  731 F.2d 909 (D.C. Cir. 1984) .......................................................................25–26

*McKesson Corp. v. Islamic Republic of Iran*,
   753 F.3d 239 (D.C. Cir. 2014) .............................................................27

*Mortimer Off Shore Servs., Ltd. v. FRG*,
   2012 U.S. Dist. LEXIS 42993 (D. Mass. Mar. 28, 2012) .........................23

*NextEra Energy Global Holdings, B.V. v. Kingdom of Spain*,
   112 F.4th 1088 (D.C. Cir. 2024) ...................................................5, 6, 19

*Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum*,
   577 F.2d 1196 (5th Cir. 1978) ..........................................................9, 13

*Sarhank Grp. v. Oracle Corp.*,
   404 F.3d 657 (2d Cir. 2005) ................................................................24

*Schneider v. Kissinger*,
   412 F.3d 190 (D.C. Cir. 2005) ........................................................9, 13

*Society for the Propagation of the Gospel v. Town of New Haven*,
   21 U.S. 464 (1823) .......................................................................11, 14

*SPC Stileks v. Republic of Moldova*,
   985 F.3d 871 (D.C. Cir. 2021) ...........................................................5, 6

*Sullivan v. Kidd*,
   254 U.S. 433 (1921) ...........................................................................29

*Techt v. Hughes*,
   229 N.Y. 222 (1920) ...........................................................................11

*Termorio S.A. E.S.P. v. Electranta S.P.*,
   487 F.3d 928 (D.C. Cir. 2007) ...........................................................30

*TIG Ins. Co. v. Republic of Arg.*,
   U.S.  110 F.4th 221 (D.C. Cir. 2024)...................................................30

*United States v. Ali*,
   718 F.3d 929 (D.C. Cir. 2013) ...........................................................29

*United States v. Caltex (Philippines), Inc.*,
   344 U.S. 149 (1952) ...............................................................10, 21, 29

*Verlinden B. V. v. Central Bank of Nigeria*,
   461 U.S. 480 (1983) ...........................................................................22

*VRG Linhas Aereas S/A v. MatlinPatterson Global Opportunities Partners II L.P.*,
   605 F. App'x 59 (2d Cir. 2015) ...........................................................24

*Weiss v. LaSuisse*,
   293 F.Supp.2d 397 (S.D.N.Y. 2003) ....................................................27

*Zhongshan Fucheng Indus. Inv. Co. v. Fed. Republic of Nigeria*,
  112 F.4th 1054 (D.C. Cir. 2024) ................................................................2, 10, 20, 21

**Federal Statutes and Rules**

28 U.S.C. §1605 ...................................................................................................... *passim*

Fed. R. Civ. P. 44.1 ...........................................................................................................28

**Treaties**

Agreement between the Cabinet of Ministers of Ukraine and the Government of the
Russian Federation on the Encouragement and Reciprocal Protection of Investments
(November 27, 1998) (BIT) ................................................................................... *passim*

Energy Charter Treaty (Dec. 17, 1994) (ECT) .................................................................6

European Convention on Int'l Commercial Arbitration, 484 U.N.T.S. 349 (1961)
(1961 Geneva Convention) ..............................................................................................10

U.N. Convention on the Recognition and Enforcement of Foreign Arbitral Awards,
21 U.S.T. 2517, 330 U.N.T.S. 38 (June 10, 1958) (New York Convention) ...................... *passim*

Vienna Convention on the Law of Treaties,
1155 U.N.T.S. 331, 8 I.L.M. 679 (Jan. 27, 1980) (VCLT) ....................................... *passim*

**International Authority**

*Deutsche Telekom v. India*, Berlin Court of Appeal, 12 Sch 7/21 (Jan. 26, 2023) .......................24

*Diag Human SE v. Czech Republic*, Brussels Court of Appeal, 2016/AR/1596
(Nov. 12, 2019) .................................................................................................................24

*Diag Human SE v. Czech Republic*, Luxembourg District Court, Civil Judgment
2019TALCH10/00094 (June 7, 2019) ..............................................................................24

French Code of Civil Procedure ("CPC") (1975) ...........................................................28

French Supreme Court, Cass. ass. plen. No. 08-16033 (Mar. 13, 2009) .......................28

French Supreme Court, Cass. civ. 1, No. 06-13293 (June 29, 2007)  ......................28, 29

*Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion*,
1996 I.C.J. Rep. 240, (July 8, 1996) ...............................................................................15

*OAO Tatneft v. Ukraine*, PCA No. 2008-8, Award (2014) .......................................12, 14

*The Russian Federation v. NJSC Naftogaz of Ukraine et al.*, No. 22/03902,
Judgment, (Dec. 6, 2024) .................................................................................................26

**Other**

Commentary on the Draft Articles on the Effects of Armed Conflicts on Treaties,
Y.B. Int'l L. Comm'n 107, 112 (2011).......................................................................8, 11

D.C. Code § 16-4403(e) (2012) ...................................................................................20

Department of Defense Law of War Manual (July 2023) (DoD Manual)...........4, 8, 10, 14, 15, 29

Draft Articles on the Effects of Armed Conflicts on Treaties,
Y.B. Int'l L. Comm'n 107 (2011)........................................................................8, 11, 13

Edwin D. Williamson, Preliminary Objections Submitted by the United States of America,
Case Concerning the Aerial Incident of 3 July 1988, I.C.J. (*Iran v. United States*)
(Mar. 4, 1991)...................................................................................................4

Gary Born, *International Commercial Arbitration* (3d ed. 2021) ...................................24

Lorraine de Germiny & Tan Charis*, Complete and Unconditional Legal Protection,*
Jus Mundi (Sep. 30, 2025) ......................................................................................12

Philippe Jacques, *Equality of belligerents between States and armed groups,*
Int'l Rev. Red Cross 928 (2025) ................................................................................13

Restatement (Second) of Foreign Relations Law (1965)..................................................3

Restatement (Third) of Foreign Relations Law § 487 cmt. f (1987) ...............................21

**Ukrainian Sources of Law**

National Bank of Ukraine Resolution No. 260 "*On Recalling and Cancellation of Banking
Licenses and General Licenses for Carrying out Foreign Currency Operations of Certain
Banks and Closing of Banks' Branch Offices Located on the Territory of the Autonomous
Republic of Crimea and the City of Sevastopol*" (May 6, 2014)
(NBU Resolution No. 260) ........................................................................................12

## PRELIMINARY STATEMENT[1]

Russia's Supplemental Motion ("Supp. Motion") established this Court lacks jurisdiction under §1605(a)(6) for two separate reasons.  First, the BIT contains no legally valid agreement to arbitrate takings during an international armed conflict ("IAC") in Crimea, as alleged by Oschadbank.  Second, the New York Convention does not apply to the Award based on the United States' "commercial reservation."  Oschadbank combined its opposition to the Supp. Motion with discussion of cases decided after the stay, permitted by the July 29, 2025 Minute Order (collectively "Opp.").  The Opp.'s ad hominem attacks and arguments lack merit.  In response to Oschadbank's new argument – issue preclusion, as directed by the *Hulley* Circuit Court, this Court should consider inviting the United States to state its position on whether issue preclusion applies to §1605(a)(6) jurisdiction, and provide directions on whether and/or how the November 14, 2025 hearing will be conducted.[2]

***First,*** this Court lacks §1605(a)(6) jurisdiction because no legally valid agreement to arbitrate IAC takings in Crimea existed for two reasons.  Under *lex specialis*, takings in the theater of armed conflict with Ukraine are governed by the law of IAC, not the law of expropriation.  Thus, Article 5(1) "expropriation" is limited to Peacetime takings, and no legally valid expropriation claim exists.  Further, the BIT's interpretation under the VCLT also dictates no legally valid agreement exists to arbitrate wartime takings under Article 5.  Neither argument concerns "scope"

---

[1] Unless otherwise stated, all emphases are added, and all citations, quotations marks, footnotes, ellipses, and brackets are omitted.  Abbreviations are those used in the MTD and Supp. Motion.  "Article" refers to the BIT.  New exhibits are attached to 2nd Sullivan declaration in further support of Supp. Motion ("2nd Sullivan Dec.", "Ex.") or declaration of French law expert Denis Bensaude ("Bensaude Dec.", "DB Ex.").

[2] *Hulley Enterprises Ltd. v. Russian Fed'n*, 149 F.4th 682, 692 (D.C. Cir. 2025) directed the District Court to do this on remand.  However, Russia has moved to stay the *Hulley* mandate pending consideration of its anticipated certiorari petition.  Russia's petition will raise an identical §1605(a)(6) jurisdictional issue to Spain's certiorari petition in *Kingdom of Spain v. Blasket Renewable Investments LLC*, No. 24-1130, for which the Supreme Court invited the U.S. to provide its position.  Thus, this Court may be "next up" on FSIA issue preclusion.

as Oschadbank argues.  Under its illogical approach, the Court would have jurisdiction to compel a sovereign to litigate the merits—either to contest an award or arbitrate a claim—by a claimant simply producing a treaty containing an arbitration agreement pertaining to some agreed subject matter, even if the dispute is not covered by the agreement as a matter of law.  As the Court suggested at the September 18, 2024 hearing, it would be "insane" and "illogical" to sustain jurisdiction over a sovereign on a claim with no legal validity.

*Second*, because Oschadbank's allegations are governed by the law of IAC, no "commercial" legal relationship under the New York Convention existed between Oschadbank and Russia for a taking during an IAC in Crimea.  Oschadbank's argument that the Convention need only "arguably" apply to sustain FSIA jurisdiction is contradicted by *Helmerich* and *Zhongshan*, which require this Court to determine whether the Convention applies as a threshold jurisdictional issue.  It would be equally illogical to compel a sovereign to litigate the merits of an award when it is not enforceable under the Convention as a matter of law.

*Finally*, the Opp. argues issue preclusion based on the 2025 French Court of Appeals decision denying annulment.  This fails on multiple grounds.  Preclusion does not apply to FSIA jurisdictional issues – which the Court should defer deciding until the United States indicates its position.  And, even if preclusion applied to FSIA, it fails on the merits because French law does not recognize issue preclusion, and even if it did, the issues in France and here are different.

## ARGUMENT

## THIS COURT LACKS JURISDICTION UNDER §1605(a)(6)

## I.    THERE WAS NO AGREEMENT TO ARBITRATE EXPROPRIATION CLAIMS UNDER THE BIT IN THE THEATER OF AN ARMED CONFLICT IN CRIMEA

### A. Russia's Argument Is Jurisdictional Because No Legally Valid Agreement Exists To Arbitrate Takings In Crimea Under Article 5(1) (Opp. 8-17)

2

"When a party challenges the existence or validity of an arbitration agreement, that question goes to the applicability of an exception to sovereign immunity and therefore is jurisdictional." *Hulley*, 149 F.4th at 687 (D.C. Cir. 2025). Here, no valid arbitration agreement exists because (1) the law of IAC supersedes the law of expropriation in Crimea, the theater of an armed conflict between Russia and Ukraine; and (2) Russia did not consent to arbitrate IAC takings under the BIT. The Opp. 8-10 distorts *de Csepel, Helmerich, Hulley*, and other cases, misleadingly asserting Russia's argument is based on the BIT's "scope." To the contrary, Russia's argument has nothing to do with whether a particular investor or investment falls within the BIT's scope, but contests the existence and validity of the alleged agreement during an IAC.

1.    **No Legally Valid Agreement Exists To Arbitrate Takings In Crimea Because The BIT Is Superseded By The Law Of IAC, As *Lex Specialis* (Opp. 8-9)**

The Supp. Motion established the BIT is superseded by the law of IAC, as *lex specialis,* in the theater of armed conflict in Crimea. The Opp. 8-9 does not contest this, mentioning the term "superseded" only once as part of a quote from an unrelated treatise, Opp. 26. Nor is *de Csepel* distinguishable because plaintiffs there sued under §1605(a)(3)'s expropriation exception. *de Csepel* and other cases are dispositive on jurisdiction for two reasons.

***First***, contrary to Opp. 8, it is irrelevant that *de Csepel* concerned the FSIA expropriation exception, because it rejected that an IAC "taking can violate both the international law of expropriation and the international laws of war." *de Csepel v. Republic of Hungary*, 752 F.Supp.3d 147, 160 (D.D.C. 2024) (citing *Republic of Austria v. Altmann*, 541 U.S. 677, 697 (2004)). It held that "the international law of expropriation did not include the taking of property of foreign nationals during war," *id.,* 162, stating such takings "relate only to injuries to aliens in times of peace." *Id.,* 160 (quoting Restatement (Second) of Foreign Relations Law pt. IV, Intro. Note ¶1). It further held the "dichotomy between private and public acts" must be preserved. *Id.*, 161 (citing

*F.R.G. v. Philipp*, 141 S. Ct. 703, 713 (2021)). The United States agrees, stating the "law of war … **supersedes ordinary law in the actual theater of military operations** … as a well-developed body of law that is separate from the principles of law generally applicable in peace." DoD Manual, §1.3.2.2.[3] While the BIT may exist on paper, it contains no legally valid agreement for arbitration of takings in Crimea because it is superseded under *lex specialis.*

**Second**, as explained in the Supp. Motion, 9-12, under the BIT itself, there is no legally valid agreement for Russia to arbitrate armed conflict takings in Crimea. Contrary to Oschadbank, *de Csepel'*s analysis applies to the §1605(a)(6) exception because the term "expropriation" in Article 5 excludes takings during an IAC. *de Csepel,* and other law cited above, confirm such takings only occur in Peacetime. Professor Starzhenetskiy's unrebutted expert report (ECF 78) further established Russia and Ukraine did not agree to arbitrate takings during an IAC under the BIT. It is not enough that the BIT contained **some** agreement to arbitrate **something**, but there must exist a "***valid*** arbitration agreement between the parties" to arbitrate the alleged dispute. *Chevron Corp. v. Ecuador*, 795 F.3d 200, 205 (D.C. Cir. 2015). Here, no legally valid agreement existed to arbitrate armed conflict takings in Crimea.[4]

## 2. *Helmerich* Establishes That This Court Must Determine A Legally Valid Claim Under FSIA As A Jurisdictional Issue (Opp. 7, 9)

The Supp. Motion established this Court must determine whether Oschadbank makes out a legally valid claim under FSIA as a jurisdictional issue based on *Bolivarian Republic of*

---

[3] *See also* Edwin D. Williamson, Preliminary Objections Submitted by the United States of America, Case Concerning the Aerial Incident of 3 July 1988, I.C.J. (*Iran v. United States*), 200-13 (Mar. 4, 1991) ("The laws of armed conflict are firmly established in customary international law as a well-developed body of law separate from the principles of law generally applicable in times of peace."), ECF 77-7.

[4] Oschadbank cites *Customs & Tax Consultancy LLC v. Democratic Republic of the Congo*, 2019 WL 4602143 (D.D.C. Sep. 16, 2019), Opp. 9, for the proposition that the arbitration exception applies to disputes unrelated to expropriation. It doesn't matter. Here, the Award is based solely on expropriation, which cannot occur in the theater of an armed conflict with Ukraine.

*Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170 (2017).  The Opp. 7's argument that §1605(a)(6) does not require establishing a violation of international law misses the point, obscuring that the issue is the legal meaning of "expropriation."  Oschadbank cannot meet its jurisdictional burden ***in this case*** because Article 5 "expropriation" under international law cannot take place legally in Crimea under the BIT.  In analyzing an almost identical issue under the §1605(a)(3) expropriation exception, *Helmerich* held "the relevant factual allegations must make out a ***legally valid claim*** … A good argument to that effect is not sufficient." *Id.*, 174.  Here, Oschadbank argues its property was taken by "expropriation," but that is not "good enough" because there was no legally valid agreement to arbitrate armed conflict takings in Crimea.  This precludes application of Article 5 (expropriation) and Article 9 (arbitration).

### 3. Application Of The Law Of  IAC Is Irrelevant To Scope Under *NextEra*, *Chevron* and *Stileks* (Opp. 10-12)

As expected, the Opp. 10-12 argues this case concerns the BIT's "scope" under *NextEra*, *Chevron*, and *Stileks.*  But none of those courts held that a legally valid agreement to arbitrate existed when an investment treaty was superseded by the law of IAC.  At the September 18, 2024 hearing, the Court observed it would be "insane" and "illogical" to argue that an agreement exists when a dispute cannot legally fall under the BIT, postulating an example involving Pepsi. *See* 9/18/2024 HT, 61-63.  If Oschadbank were correct, there would be jurisdiction over Russia under the BIT, forcing it to litigate the merits, if the investment was made by Pepsi (even though it is not an investor of Ukraine), or in the United States (even though this is not Russian territory), or in the 1980's (even though Article 12 excludes investments made before January 1, 1998), or the alleged taking was pled to have taken place in the theater of an armed conflict in Crimea to which the BIT does not legally apply.  No D.C. Circuit decision requires these absurd results, risking subjecting the United States to reciprocal treatment abroad.

***First,*** Russia did not consent to arbitrate takings in a theater of an armed conflict with Ukraine ***with any investor***. Period, full stop. By contrast, in *NextEra,* it was "common ground that, in ratifying the ECT, Spain provided 'unconditional consent' to arbitrate investment disputes with the investors of at least some of the other signatory nations." *NextEra Energy Global Holdings, B.V. v. Kingdom of Spain,* 112 F.4th 1088, 1102 (D.C. Cir. 2024). Contrary to the Opp. 11, *Chevron* did not hold that producing the BIT and notice of arbitration was sufficient. For jurisdiction, *Chevron* recognized Ecuador had the opportunity to demonstrate that the BIT "did not constitute a ***valid*** arbitration agreement between the parties." 795 F.3d at 205. *Chevron* further held the district court erred by eschewing whether the notice accepted the alleged offer. *Id.,* 205 n.3. Here there was no offer to arbitrate IAC takings that Oschadbank could accept. In *SPC Stileks v. Republic of Moldova,* 985 F.3d 871 (D.C. Cir. 2021), "one jurisdictional fact [was] in dispute: whether [the] award was made pursuant to the ECT," *id.,* 877 – not whether the arbitration provision was valid.[5]

***Second***, contrary to the Opp. 12, Russia's argument that *Chevron, Stileks,* and *NextEra* concerned factual, not solely legal disputes, is not disingenuous, but correct. *Chevron* concerned "purely factual predicates" of an award or arbitration agreement, *id.,* 204; *Stileks* concerned "one jurisdictional fact … in dispute: whether [the] award was made pursuant to the ECT," *id*., 877; *NextEra* concerned the jurisdictional fact of consent to an arbitration agreement, *id*., 1102. In other words, those cases addressed the ***factual*** building blocks of an agreement to arbitrate and an award. Here, Russia asserts the BIT is ***legally invalid*** by operation of the law of IAC, and the term

---

[5] The Opp. 13 cites to two Crimea related cases where Russia's motion to dismiss was denied and are now on appeal. However, both cases were brought by private parties, not an entity 100% owned by Ukraine; neither case concerned *de Csepel* and the law of IAC, or other issues raised here. Thus, the Nouvel international law expert report (ECF 40) was not presented there. No case cited in Opp. fn. 1 concerned Russia.

"expropriation" legally excludes wartime takings.

### 4. Determination Of The Validity Of The BIT Is Jurisdictional Under *Hulley* (Opp. 12-13)

*Hulley* confirms that "[w]hen a party challenges the existence or validity of an arbitration agreement, that question goes to the applicability of an exception to sovereign immunity and therefore is jurisdictional." *Id.,* 688. The Opp. 7 focuses on the word "existence," ignoring that *Hulley* made clear that challenging the "validity" of an agreement is equally jurisdictional. To be clear, Russia is not arguing lack of jurisdiction based upon an unqualified investor or investment, or that the taking would "not qualify as an 'expropriation' within the meaning of the BIT" if it did not occur in the theater of an armed conflict with Ukraine. Opp. 12. Unrelated to scope, Russia argues that "expropriation" itself under the BIT is "superseded" in Crimea by the law of IAC leaving Article 5 expropriation and Article 9 arbitration legally invalid. In addition, as explained by the Starzhenetskiy report, Article 5 "expropriation" by definition does not apply in a theater of an armed conflict with Ukraine. Both arguments contest legal validity. The Opp. 13 also argues Russia delegated arbitrability. Putting aside Russia did not delegate jurisdictional issues to the tribunal, *see* MTD Reply, (ECF 51), 14-19, this is irrelevant. *Hulley* specifically held that because the validity or existence of an "arbitration agreement is a jurisdictional fact under the FSIA, the district court [was] required to decide Russia's [jurisdictional] claim de novo, without deferring to the Tribunal's conclusions." *Hulley,* 149 F.4th at 690.

### 5. The Law Of IAC Superseded, Not Suspended, The International Law Of Expropriation And BIT In Crimea (Opp. 14-15)

The Supp. Motion, 9-13, established that the BIT was ***superseded*** by the law of IAC, as *lex specialis*, in Crimea. The Opp. 14-15 attempts to confuse the issue by claiming Russia argued the BIT is "suspended." However, there was no need for Russia to claim the BIT was suspended because the BIT was not legally valid in the theater of an armed conflict with Ukraine. In any

case, suspension of a treaty is no different from being superseded here: the BIT has no legal effect in the theater of an armed conflict with Ukraine.  To be sure, "treaties … having a political character, the object of which is to promote relations of harmony between nation and nation, are generally regarded as belonging to the class of treaty stipulations that are absolutely annulled by war." *Karnuth v. U.S.*, 279 U.S. 231, 237 (1929).  The Commentary on Draft Articles on the Effects of Armed Conflicts of Treaties,[6] quoting *Karnuth*, confirms this view of termination of "treaties incompatible with hostilities." *Id.*, 112.  Contrary to the Opp. 18, the Commentary also confirms that while not all armed conflicts "*ipso facto*" end treaties, such as treaties of cessation or for boundary disputes, many treaties "indeed lapse … on the account of their nature, commercial treaties for instance." *Id.*  Importantly, "***infringements on the law of war through international agreements that primarily address situations other than armed conflict are not to be presumed.***" DoD Manual, §1.3.2.2.  The Opp. 14 admits circumstances when a treaty has no legal effect, noting a treaty suspension "releases the parties … from the obligation to perform the treaty in their mutual relations during the period of suspension."  VCLT, Art. 72(1)(a)-(b).  Here, the BIT had no legally valid effect because it was superseded (or alternatively suspended) when the alleged IAC in Crimea commenced.

### 6.    Oschadbank's Purported "Policy" Arguments Are Wrong and Irrelevant (Opp. 15-17)

Unable to refute Russia' caselaw, the Opp. 15-17 attempts to recharacterize precedent based merely on "policy."  This is nonsense.

***First,*** *Helmerich* held that the FSIA was meant to embody a "'restrictive' theory of sovereign immunity" to avoid "embroil[ing] the foreign sovereign in an American lawsuit for an

---

[6] *See* Draft Articles on the Effects of Armed Conflicts on Treaties, Y.B. Int'l L. Comm'n 107, 107 (2011) ("Draft Articles"); Commentary on the Draft Articles on the Effects of Armed Conflicts on Treaties, Y.B. Int'l L. Comm'n 107, 111-12 (2011) ("Draft Articles Commentary").

increased period of time.'" *Helmerich*, 581 U.S. at 180, 183.  Nonetheless, in the guise of "policy,"
the Opp. 16 argues restrictive sovereign immunity principles do not apply to purported "unlawful
expropriations" during an IAC.  It cites *Brown v. United States*, 12 U.S. 110 (1814), arguing that
a declaration of war does not permit takings by the U.S., absent authorization from Congress, and
courts should not grant foreign states immunity when the U.S. "would subject itself to suit in like
cases."  This is doubly wrong.  The United States' domestic obligations do not implicate FSIA,
which sets forth six limited exceptions to immunity.  The United States subjects itself to all types
of claims which are not covered by FSIA.  Moreover, even in this situation, "the United States
does not have to answer under the Takings Clause for the destruction of enemy property … a
concept so manifest that it hardly requires further elaboration." *El-Shifa Pharm. Indus. Co. v.
United States*, 378 F.3d 1346, 1352 (Fed. Cir. 2004) (affirming dismissal of claims for destruction
of a plant in Sudan under the Takings Clause).

   Nor can this Court decide a political question such as the "lawfulness" of Russia's conduct
in Crimea, where sovereignty is disputed, under the disjunctive six-point jurisdictional test set
forth in *Baker v. Carr*, 369 U.S. 186, 217 (1962).  *See Occidental of Umm al Qaywayn, Inc. v. A
Certain Cargo of Petroleum*, 577 F.2d 1196, 1203 (5th Cir. 1978) ("[R]esolution of a territorial
dispute between sovereigns . . . is a political question which we are powerless to decide.");
*Schneider v. Kissinger*, 412 F.3d 190, 198 (D.C. Cir. 2005) (jurisdictional dismissal of a claim
related to acts in support of a military coup in Chile based upon the political question doctrine);
*El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 844 (D.C. Cir. 2010) (affirming
dismissal of complaint alleging violation of international law for destruction of a plant in Sudan
which was "barred by the political question doctrine" because it would require a judicial
determination of whether the attack was "justified").

***Second***, contrary to the Opp. 17, recognition of the Award is precluded under the law of IAC because allowing private claims could undermine any post-conflict resolution between Russia and Ukraine.  The Opp. resorts to ad hominem attacks regarding the lawfulness and motivations of Russia, which are not justiciable, *supra*.  It also argues under the guise of policy that it "makes no sense" for the arbitration exception to be restrictive, leaving only States to resolve claims of their citizens.  However, this is not mere "policy."  Long standing precedent holds a State has no private party liability for wartime takings, even if alleged to be improper.  Compensation is resolved by the States.  *See United States v. Caltex (Philippines), Inc.*, 344 U.S. 149, 155-56 (1952) ("This Court has long recognized that in wartime many losses must be attributed solely to the fortunes of war, and not to the sovereign."); *Doe v. United States*, 95 Fed. Cl. 546, 556 n.2, 559-563 (2010) (collecting cases holding "the sovereign is immune from claims for takings occurring during wartime or that are rooted in military conflicts").  *See also* DoD Manual, §18.16.4 ("Customary international law and the 1949 Geneva Convention do not provide a private right to individuals to claim compensation directly from a State; rather, such claims are made by other States.").  Finally, in a throw-away argument, the Opp. 17 argues under *Zhongshan,* the arbitration exception should not be limited because the rule of State-to-State espousal does not apply when a ***valid*** agreement allows investors to bring claims.  While that may be true, there is no legally valid agreement to arbitrate claims in Crimea here.

## B.  There Is No Agreement To Arbitrate Because The Law Of IAC Supersedes The BIT In Crimea As *Lex Specialis* (Opp. 17-23)

The Supp. Motion, 9-13, established that the law of IAC operates as *lex specialis*, superseding the BIT, and specifically Article 5's expropriation provision, in takings in Crimea. The Opp. 17-23 makes two irrelevant and meritless arguments in response.

## 1. Russia Argued The BIT Was Superseded By The Law Of IAC In Crimea, Not That The BIT Was Suspended (Opp. 17-21)

Instead of addressing Russia's argument that the BIT is superseded in Crimea, the Opp.'s key defense, Opp. Point 3(a), is a strawman argument offering four reasons why the alleged "illegal invasion did not suspend the BIT." But Russia's argument (again) is that the law of IAC supersedes, as *lex specialis*, the BIT in Crimea. Russia does not argue suspension. Nonetheless, regardless of semantics, under *lex specialis*, the law of expropriation does not apply in Crimea.

***First,*** the Opp. 18-19 argues that treaties protecting property rights are "preserved" during armed conflicts, citing *Society for the Propagation of the Gospel v. Town of New Haven*, 21 U.S. 464, 492-95 (1823), and *Clark v. Allen*, 331 U.S. 503, 508 (1947) ("*Allen*"). Those cases, however, addressed whether treaties vanish *ipso facto* at the outbreak of war, and whether private law rights such as inheritance or title persist. They do not hold that expropriation clauses or other Peacetime norms regulate IAC takings and permit claims against sovereigns. The Opp. 18 also asserts that these cases "reflect customary international law," citing Draft Articles on the Effects of Armed Conflicts on Treaties and Draft Articles Commentary, *supra*. Asserting that under the Draft Articles, Art. 7 and Annex (e), "treaties of friendship, commerce and navigation and agreements concerning private rights" continue to "presumptively apply during armed conflict," Oschadbank omits that the Draft Articles Commentary also recognizes that many "may indeed lapse or be suspended on account of their nature, ***commercial treaties for instance.***" *Id*., Art. 3, ¶2 (citing *Techt v. Hughes*, 229 N.Y. 222, 245-46 (1920) ("Friendly intercourse between nations is impossible in war. Therefore, treaties regulating such intercourse are not operative in war."), and *Allen*, 331 U.S. at 509-10 (discussing *Techt* with approval)). Neither *Society* nor *Allen* hold that expropriation law clauses or norms regulate wartime losses. The Opp. 19 also refers to *Karnuth*, but it supports Russia's position. The Court made clear that whether treaty provisions

survive war "depends upon their intrinsic character," *Karnuth*, 279 U.S. at 236, and that those inconsistent with a state of hostilities are suspended. [7]  Rights to commerce are precisely the kind of reciprocal privileges that cannot operate amid an IAC.

   **Second,** the Opp. 20 cites Article 2(2) and Article 6 to argue the BIT continues to apply during an IAC.  Article 2(2) is irrelevant because it was not a basis for the Award.  Also, its "full and unconditional legal protection" clause is unique to Russia's practice[8] and guarantees only the maintenance of a lawful and non-discriminatory legal regime – it is a commitment to ***legal*** security, not physical or wartime protection of property.  *See OAO Tatneft v. Ukraine*, PCA No. 2008-8, Award (2014) (Ex. 12), ¶¶334, 340, 355-56 (Russian claimant, Ukraine, and tribunal all agreed that Article 2(2) is only "an assurance to the investor that the [host State's] laws will be applied," noting that "not many BITs have included this kind of protection").  Russia did so by seeking to bring Ukrainian banks into compliance with its banking laws to permit their continued operation in Crimea.  In response, Ukraine ordered Oschadbank and other Ukrainian banks to leave Crimea.  *See* NBU Resolution No. 260 (ECF 42-6).  Further, Article 6's very existence proves that Article 5 does not apply during an IAC, as the BIT expressly distinguishes wartime losses under Article 6 from peacetime expropriations under Article 5.  Reading wartime losses into Article 5 expropriation provision ignores this structure.

   ***Third,*** the Opp. 20-21 argues Russia cannot suspend the BIT because an "aggressor"

---

[7] Oschadbank labels *Ex parte Zenzo Arakawa*, 79 F.Supp. 468 (E.D. Pa. 1947) as an "outlier," ignoring it reflects an accepted principle that treaty provisions incompatible with hostilities will yield to wartime realities.  Contrary to the Opp. 19-20, *Allen* confirmed *Arakawa*: "There may of course be such an incompatibility between a particular treaty provision and the maintenance of a state of war as to make clear that it should not be enforced." 331 U.S. at 508.

[8] *See* Lorraine de Germiny & Tan Charis, *Complete and Unconditional Legal Protection*, Jus Mundi, available at *https://jusmundi.com/en/document/publication/en-complete-and-unconditional-legal-protection* ("This standard of protection is relatively rare and found primarily in investment treaties concluded by the Russian Federation.") (Ex. 13).

cannot benefit from allegedly unlawful conduct, citing Draft Articles, Art. 15, the Kellogg-Briand Pact, and VCLT Commentary. But the principle *ex injuria jus non oritur* ("a right does not arise from wrongdoing") would require determining whether Russia was right (or wrong) about Crimea – a non-justiciable political question not before this Court. *See Occidental,* 577 F.2d at 1203*; Schneider,* 412 F.3d at 198*; El-Shifa,* 607 F.3d at 844, *supra.* Furthermore, the law of IAC applies regardless of how hostilities arise. International law separates *jus ad bellum*, the body of law governing the conditions under which States may lawfully resort to the use of armed force, from *jus in bello*, the body of law governing the conduct of parties during an IAC. The latter mandates that the law of IAC as *lex specialis*, applies equally to both sides in an IAC, irrespective of the legality of their use of force under *jus ad bellum.*[9]

  ***Fourth,*** putting aside its ad hominem attacks and false accusation of a "lie," the Opp. 21 irrelevantly claims Russia failed to provide a notice of its intention to suspend the BIT in accordance with VCLT Art. 65. Russia did not seek to suspend or terminate the BIT in 2014, and does not now argue that the BIT was suspended overall. Based on Oschadbank's own allegations, the BIT was automatically superseded by *lex specialis* of the law of IAC ***in Crimea,*** without any notice requirement, and, further, as *lex specialis*, it limits the term "expropriation" in Article 5 to Peacetime takings.

### 2. The Law Of IAC As *Lex Specialis* Supersedes The International Law Of Expropriation And Investment Treaties (Opp. 21-23)

  "Expropriation" provisions in investment treaties, such as Article 5, concern takings that take place during Peacetime, not during an IAC, which are subject to the *lex specialis* of the law of IAC. *See* Supp. Motion, 9-13; VS Dec. ¶¶71-77, 85-89. As stated by the United States, the

---

[9] Philippe Jacques, *Equality of belligerents between States and armed groups,* Int'l Rev. Red Cross 928 (2025), https://international-review.icrc.org/articles/equality-of-belligerents-between-states-and-armed-groups-928 (Ex. 14).

law of IAC "is separate from the principles of law generally applicable in peace," and "supersed[es] ordinary law in the theater of military operations."  DoD Manual, §1.3.2.2.7.  *See also* VS Dec. ¶¶86-89.  The Opp.'s contrary arguments, Point 3(b), 21-23, lack merit.

*First,* the Opp. 20 again relies on Article 2(2)'s "full and unconditional legal protection" clause to argue that the BIT continues to apply during an IAC.  As explained above, it is irrelevant because it is not a basis for the Award.  Further, Russia's unique "full and unconditional legal protection" standard guarantees only the maintenance of a lawful and non-discriminatory legal regime – "an investor can rely on the assurance that the laws [of the host State] will be applied." *See OAO Tatneft, supra,* ¶356.  The Opp. 21 attempts to equate it with a "full protection and security" obligation common to other investment treaties, asserting that "Article 2(2) … suggest[s] that the investment protections are as broad as possible," but this collapses a textually distinct and narrower provision into a far broader one the Parties never adopted.

*Second,* the Opp. 21 misrepresents the Tribunal's analysis of "expropriation," challenging Russia's alleged failure to distinguish the arbitral decisions cited by the Tribunal.  None of it matters.  *Hulley* held that courts must independently decide FSIA jurisdiction; the arbitrators' decision has no preclusive effect.  *Hulley*, 149 F.4th at 688.  Further, given Russia did not participate in the arbitration, the Tribunal never considered whether an expropriation can take place in the theater of an armed conflict with Ukraine.  It cannot.[10]

*Third,* the Opp. 21-22 claims Russia relies on "outdated and inapposite authority," which is both incorrect and ironic, given the cases it cites.[11]  It also argues that *Ex parte Quirin*, 317 U.S.

---

[10] Contrary to Oschadbank, the Tribunal did not find that expropriation includes "all permanent takings 'that result in a substantially complete deprivation of … property.'" *Id.* (quoting Award, ¶284 (ECF 1-2)).  Rather, it merely found an expropriation must meet these standards.  Award, ¶284.  It does not mean such takings constitute "expropriations" in an armed conflict with Ukraine and the Tribunal never held so.  *Id.*

[11] The Opp. 22 points to *Juragua* ("one 1909 case") as "outdated," while also citing a 1814 case *Brown*, Opp. 16, and a 1823 case *Society*, Opp. 18, as presumably good law.

1, 27-28 (1942), DoD Manual § 1.3.2.2, and *Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion*, 1996 I.C.J. Rep. 240, ¶84 (July 8), cited by Russia for what Oschadbank describes as "the generic proposition that the law of armed conflict is *lex specialis* during periods of armed conflict," are inapposite because "that does not affect the BIT's scope." Opp. 21-22. Russia does not allege that the law of IAC "affects" the BIT's "scope"; rather, as *lex specialis*, it **supersedes** the law of expropriation, *see*, e.g., DoD Manual, §1.3.2.2.7, *supra.*, and, further, gives meaning to the term "expropriation" under international law.

Oschadbank then attacks *Juragua*, as being limited to its facts, decrying Russia's quoted language from that case, *see* Supp. Motion, 10, as "dicta" that "does not reflect international law." Opp. 22. *Juragua*'s holding went beyond its factual context, reaffirming a fundamental principle of the law of IAC that property located in enemy territory is treated as enemy property and may be destroyed or seized. The reason the Court denied recovery was precisely that the destruction occurred in the course of military operations governed by the law of war. The Opp.'s appeal to Hague IV Regulations, 22, as requiring private property "be respected" during and IAC and forbidding "confiscat[ion]," fares no better. Rather, it is a concession the law of IAC applies in Crimea, not the law of expropriation. The Hague IV Regulations are not a civil code, but specifically a *lex specialis* instrument regulating the conduct of international hostilities, which do not provide private causes of action or arbitration.

**Fourth,** the Opp. 22-23 again tries to distinguish *de Csepel* as merely construing the FSIA's expropriation exception, arguing that Article 2(2) guarantees "full and unconditional" protections against expropriations "far broader than the FSIA's expropriation exception." Aside from misconstruing Article 2(2), *supra*, "the international law of expropriation did not include takings in violation of the international laws of war." *de Csepel*. 752 F.Supp.3d at 160.

**C. Russia And Ukraine Did Not Agree To Arbitrate Takings During an IAC Between Them Under The BIT, Including Article 5 (Opp. 23-26)**

The Supp. Motion, 13-20, supported by the unchallenged legal expert opinion of Professor Starzhenetskiy, established that Russia and Ukraine did not agree in the BIT to arbitrate takings during armed conflicts between them. Russia's expert provided an exhaustive interpretation of the BIT under well-established principles set forth in the Vienna Convention on the Law of Treaties ("VCLT"), including Art. 31(1) (object and purpose, and ordinary meaning), Art. 31(3)(c) (*lex specialis*), and Art. 32 (*travaux préparatoires*, and each State's other BITs). He concluded that Articles 5 and 6 do not apply to Oschadbank's expropriation claims arising from the alleged armed conflict between Russia and Ukraine in Crimea. The Opp. 23-36 haphazardly controverts these conclusions, but, tellingly, presents no contrary expert opinion of its own.

*First,* the Opp. 23 (quoting VS ¶90 (ECF 78)) erroneously asserts that Russia's expert contends only that the law of IAC does not provide a private right to compensation for its violations. It then argues that Russia cannot prove that the laws of armed conflict "do not prohibit expropriations" in order to establish Article 5 does not apply. These arguments turn Russia's position on its head. The Article 9 arbitration clause does not apply because the alleged taking is not an Article 5 expropriation. Rather, it is a taking governed by the law of IAC that supersedes, as *lex specialis*, the BIT in Crimea, including Article 5. Whether the law of IAC prohibits certain takings, or contains obligations for compensation of takings during hostilities, it still supersedes the BIT as *lex specialis* in the first place, and, thus, any dispute concerning IAC takings is clearly outside Article 5 and Article 9 arbitration.[12]

*Second,* Russia's Supp. Motion and expert declaration established that Article 5 does not

---

[12] Contrary to the Opp. 23 n.7, it is immaterial whether the purported test for a permissible "uncompensated taking" during an IAC is similar to the test for a "lawful expropriation" applied under Article 5. Because the BIT was superseded, no arbitration could be maintained.

encompass takings during armed conflicts between Russia and Ukraine by analyzing, inter alia, the BIT's "object and purpose," under VCLT Art. 31(1). *See* VS Dec. ¶¶14-30; Supp. Motion, 13-15. The Opp. 25 asserts only that "construing Article 5 to cover expropriations during armed conflict furthers [the BIT's] objective" to encourage investment. This ignores that some BITs contain so-called "war clauses" which regulate investors' rights and host States' obligations in connection with wartime losses, providing for different types of protection to investors, as agreed by the contracting States. VS Dec. ¶¶73, 74. Russia and Ukraine distinguished between wartime takings, agreeing only to a non-discrimination war clause (MFN) in Article 6, and peacetime takings expropriation clause in Article 5, as they deemed appropriate to further the "object and purpose" of the BIT. They did not agree "expropriation" covers wartime takings, which Russia explicitly rejected as explained in the Supp. Motion, 19-20, and Starzhenetskiy's declaration, ¶¶96-109, with Appendix A.

**Third,** Russia's Supp. Motion and expert established, also under VCLT Art. 31(1), that the "ordinary meaning" of Article 5 "expropriation" does not encompass takings during armed conflicts between Russia and Ukraine, relying in his analysis, inter alia, on Russian and Ukrainian domestic law and practice. *See* VS Dec. ¶¶31-80; Supp. MTD, 15-18. The Opp. 23 mocks Starzhenetskiy's opinion as asserting only that, "because the Soviet Union did not guarantee the right to compensation for takings in World War II, Ukraine and Russia must have understood that wartime expropriations would not give rise to compensation" and references Stalinism. Indeed, both countries' legal systems sprang from a common predecessor, the USSR, which clearly distinguished between peacetime takings, mostly compensable (regardless of what the Opp. states about private property rights in the USSR), and wartime takings (never defined as "expropriation"), addressed through martial law and post-conflict treaties. VS Dec. ¶¶37-55. This system was

inherited by both Russia and Ukraine and remained much the same in both countries when they negotiated and signed the BIT. *Id*. ¶¶38-49. The Opp.'s gratuitous insults referencing "Stalinism" ignore that Russia and Ukraine's shared legal systems had the same pedigree which continued for ***forty years*** after Stalin's death.

**Fourth,** against this historical backdrop, the Opp.'s claimed "broader context" of Ukraine ratifying the BIT four years after giving up nuclear weapons in exchange for security guarantees is irrelevant to interpreting how Russia and Ukraine understood "expropriation" in Article 5. Contrary to the Opp. 24, no one is suggesting that either party negotiated the BIT with a view to leaving open the door to invade the other and take its property. It does not follow, however, that the parties consented to delegate their respective essential sovereign powers in an IAC to redress by arbitration. Contrary to the Opp. 24, without express consent, such result would be indeed untenable to any sovereign, let alone a global power like Russia, or the United States.

**Fifth,** the Opp. 25 erroneously asserts that Russia's interpretation of Article 5 as applying only in Peacetime and Article 6 as applying to losses related to armed conflicts, "misreads" both Articles, creating a non-existent "war-and-peace dichotomy."[13] Acknowledging that "war clauses" exist, the Opp. 26 argues that the inclusion of such clauses by other states in their BITs "does not suggest that protections against expropriation disappear during war," but, at most, "shows that [such] other states have been more explicit in making clear that wartime losses are compensable." This ignores the obvious – Article 6 ***is*** a "war clause" itself (the MFN type). VS Dec. ¶¶73-77. Accordingly, Russia and Ukraine ***have been*** explicit in their intentions with regard to treatment of wartime losses, as opposed to peacetime takings, the latter being covered in Article

---

[13] Contrary to the Opp. 25, the fact that Article 6 applies also in cases of "civil disturbances and other similar circumstances" (i.e., not only during an IAC) does not bear on the fact that takings in an IAC are addressed in Article 6, separately from Peacetime expropriations addressed in Article 5.

5.  Notably, the Opp. completely ignores the expert's analysis under VCLT Art. 32 of Russia's and Ukraine's other BITs, which establishes that both counties understand and use "war clauses" based on their interests.  *See* Supp. MTD, 20; VS Dec. ¶¶58-65, 110-112; Appendices B and C.

*Sixth,* the Opp. 26 fails to provide a meaningful response to Russia's expert's review of the BIT's *travaux préparatoires* under VCLT Art. 32, confining itself to belittling the expert's presentation as "abridged" and asserting baldly that it "fails to persuade."  The communications between Russia and Ukraine conclusively establish Russia rejected Ukraine's proposal to include armed conflict takings under expropriation provisions, and Ukraine acceded to Russia's position. *See* Supp. MTD, 19-20; VS Dec. ¶¶99-109; Appendix A.  Tellingly, Oschadbank does not offer any other *travaux préparatoires* materials to support a different interpretation of Articles 5 and 6.

## II.    THE NY CONVENTION DOES NOT APPLY BECAUSE THE AWARD DID NOT ARISE OUT OF A COMMERCIAL LEGAL RELATIONSHIP (Opp. 26-28)

### A.  This Court Must Determine If The New York Convention Applies As A Jurisdictional Issue (Opp. 26-27)

§1605(a)(6) provides jurisdiction to compel arbitration or enforce an award if the "agreement or award is or may be governed by a treaty" providing for enforcement. The Opp. 27 attempts to parse the "is or may be governed" language, relying on *Chevron*, 795 F.3d at 204, n.2, to argue that there is no requirement that the Award "is" governed by a treaty.  However, this is dicta because *Chevron* noted "[t]he distinction is irrelevant for purposes of this case, as the parties do not dispute that the New York Convention governs arbitral awards issued pursuant to the BIT." *Id.* Oschadbank's reliance upon *NextEra* is misplaced for the same reason: "Spain d[id] not dispute that the companies have demonstrated arbitration awards and a treaty governing the enforcement of the awards in the United States." *NextEra*, 112 F.4th at 1101.  After *Chevron*, *Helmerich* held courts must resolve jurisdictional facts before reaching the merits*,* and subsequent Circuit

precedent establish that it is not enough to merely point to a treaty potentially governing the award. This is not a merits argument, but jurisdictional.

*Diag Human v. Czech Rep. - Ministry of Health*, 824 F.3d 131 (D.C. Cir. 2016) determined jurisdiction by resolving the dispute of "whether the arbitration award '***is or may*** be governed by a treaty ... calling for the recognition and enforcement of arbitral awards'" by holding the plaintiff "satisfied ***its burden of showing*** that its arbitration award '***may be governed***' by the New York Convention because … [plaintiff] had a legal relationship with the Czech Republic, and additionally, that relationship was commercial in nature." *Id.*, 135.  "May" required the claimant to establish a commercial relationship.   For the purposes of FSIA jurisdiction, the Court factually determined the purported "legal relationship" between the parties was "commercial in nature." *Id.*, 136.  Oschadbank also ignores *Zhongshan*, a 2024 case, in which the sole issue on appeal was whether the Convention governed the arbitration award for purposes of the FSIA arbitration exception.   There, the Court also factually determined the Convention applied, holding the "Final Award is enforceable under the New York Convention because it arose out of differences between 'persons' that share a legal, commercial relationship. The district court therefore has jurisdiction over this case under the FSIA's arbitration exception." *Zhongshan*, 112 F.4th at 1075.[14]  In sum*, whether the Convention "may apply" is a jurisdictional issue which necessitates a judicial determination of how it applies, and specifically, whether there is a commercial relationship.

## B. Oschadbank's Allegations, And Ukraine's Positions Establish There Is No Commercial Legal Relationship Under The Law Of IAC (Opp. 27-28)

The Supp. Motion, 20-25, established there was no commercial relationship between Russia and Oschadbank from its inception because the relationship arose solely under the law of IAC, as

---

[14] The Opp. 27, n. 10, suggests that if Oschadbank cannot confirm the Award under the New York Convention, it could do so under D.C. Code §16-4403.  Obviously, the D.C. Code is not a treaty or international agreement, and, thus, cannot satisfy §1605(a)(6)'s plain text.

Oschadbank alleged.  *Id.*, 2-4.  The Opp., 27, counters that its relationship with Russia is commercial because it conducted commercial activity in Crimea, but ignores this occurred when Crimea was part of Ukraine, glossing over **all** alleged takings occurred **during** the armed conflict. *See* Petition, ¶¶1, 26, 69, 170-175.  Merely calling a relationship commercial does not make it so.

      **First**, Oschadbank does not dispute no commercial relationship is created by the BIT itself. Put simply, under *de Csepel,* no commercial relationship was created by Russia exercising public regulatory control of Oschadbank in the theater of armed conflict.  *See de Csepel,* 161 (noting the "dichotomy between private and public acts" must be preserved, citing *Philipp*, 592 U.S. at 183). Oschadbank's argument that *Zhongshan* rejected the notion a commercial transaction is required misses the point because the parties' only interaction here occurred under the law of IAC.  No commercial legal relationship is created by a sovereign's takings in an alleged theatre of an IAC. *See Juragua,* at 305-306; *Caltex,* at 155-56; *Doe,* at 556 n.2, 559-563 (collecting cases).

      **Second**, the commercial reservation exception does not apply to public law disputes between sovereigns.  *See* Rest. (Third) of Foreign Relations Law §487, cmt. f. ("arbitration of a controversy of a public international law character… is not subject to the New York Convention").  While Oschadbank argues this is not a public international law dispute, it asserts Russia violated public international law by asserting sovereignty over Crimea.  Petition, ¶1; Statement of Claim, ¶13 (ECF 42-33).  It cannot have it both ways.  Oschadbank also argues under *Zhongshan* that only disputes between States are public international law disputes and investor-state disputes are not included. This ignores this dispute does not arise out of an investor-state relationship, but the law of IAC. Russia never approved Oschadbank's investment into Crimea.  Nor does *Zhongshan* suggest that because a public international law dispute impacts an individual through takings or otherwise, a commercial relationship exists with that State.

III.   THE 2025 FRENCH COURT OF APPEALS DECISION IS NOT COLLATERAL
       ESTOPPEL ON FSIA JURISDICTION  (Opp. 4-8)

The Opp. 4-8's reliance on the French Court of Appeal's July 1, 2025 decision ("French Decision") is misplaced because foreign judgments have no issue preclusion effect on U.S. courts' jurisdiction under FSIA.  Alternatively, its argument fails on multiple other grounds.

A. Issue Preclusion Based On Foreign Judgments Does Not Apply To §1605(a)(6) Jurisdiction (Opp. 4)

FSIA "must be applied by the district courts in every action against a foreign sovereign, since subject-matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity." *Verlinden B. V. v. Central Bank of Nigeria*, 461 U.S. 480, 493 (1983).  *Hulley* confirmed §1605(a)(6) "[j]urisdictional questions must be independently analyzed by the court." *Id*., 149 F.4th at 688.  Remanding to consider whether foreign judgments can have preclusive effect on FSIA jurisdiction, *Hulley* provided "guidance for the task." *Id*., 691. It directed considering "whether issue preclusion applies to jurisdictional questions under the FSIA," and then "whether preclusion extends to *foreign* judgments." *Id*. (emphasis in original). Noting that some courts "have given preclusive effect to [FSIA] jurisdictional determinations by *domestic* courts," *Hulley* court stated, "We are aware of no case, and the parties point to no case, in which a court has given preclusive effect to a *foreign* judgment in order to exercise jurisdiction over a foreign sovereign under the FSIA." *Id*.

*First,* issue preclusion should not apply to jurisdictional questions under FSIA. "The statute requires the District Court to *satisfy itself*" that an FSIA exception applies.  *Chevron*, 795 F.3d at 205 n.3.  This is a foundational §1605(a)(6) jurisdictional principle, reaffirmed by *Hulley*, in the context of §1605(a)(6) "that must be *independently* determined by the court." *Id*., 149 F.4th at 690. In the three cases cited by *Hulley*, 691 n.7, where issue preclusion effect was given to domestic judgments, the applicability of the doctrine under FSIA was merely assumed, and all are easily

distinguishable.[15]  While issue preclusion may apply to jurisdiction in other contexts, Opp. 4, FSIA is fundamentally different because it concerns U.S. foreign policy interests.  Furthermore, issue preclusion is an equitable doctrine, and *offensive* issue preclusion is "even a cut above that in the scale of equitable values.  It is a doctrine of equitable discretion to be applied only when the alignment of the parties and the legal and factual issues raised warrant it… Its application is controlled by the principles of equity [and] fairness to both parties must be considered when it is applied."  *Jack Faucett Assocs., Inc. v. AT&T*, 744 F.2d 118, 125 (D.C. Cir. 1984).  The application of issue preclusion offensively is fundamentally unfair, particularly because Russia did not choose the seat of arbitration, the Opp. 8's inexplicably false suggestion to the contrary.

**Second,** issue preclusion should not apply to jurisdictional questions under FSIA based on foreign judgments.  Questions of sovereign immunity must be decided independently by U.S. courts, applying U.S. law (FSIA) – just as such jurisdictional questions are decided by other countries' courts, under ***their*** national laws (if any) on immunity.  Critically, France does not have a sovereign immunity law similar to FSIA, and French courts do not specifically consider foreign sovereigns' immunity in actions for annulment or enforcement of international arbitral awards.  *See* Bensaude Dec., ¶¶11-13, 59-63.  Unlike *Helmerich* and other U.S. cases, French courts do not consider the reciprocal treatment of France, let alone the United States and its foreign relations, and the burden imposed by litigation, when deciding whether to enforce arbitral awards against sovereigns.  The French decision, made under French law, should not dictate FSIA jurisdiction as determined by U.S. courts applying U.S. law.

---

[15] Two cases involved defensive issue preclusion by sovereigns, where lack of jurisdiction under FSIA had already been established. *See Gupta v. Thai Airways Int'l, Ltd.*, 487 F.3d 759, 765-67 (9th Cir. 2007) (giving preclusive effect to a state court decision finding no FSIA jurisdiction); *Mortimer Off Shore Servs., Ltd. v. FRG*, 2012 U.S. Dist. LEXIS 42993 (D. Mass. Mar. 28, 2012) (giving preclusive effect to Second Circuit decision that the dispute did not fall within FSIA).  The third case did not involve a foreign sovereign.  *Biton v. Palestinian Interim Self-Government Auth.*, 412 F.Supp.2d 1, 4-5 (D.D.C. 2005) (no re-litigation that respondent was not a sovereign).

***Third,*** the inapplicability of issue preclusion based on foreign judgments to FSIA jurisdiction is supported by the analysis issue preclusion based on foreign judgments under the New York Convention (which, in relevant parts, was largely copied by Congress into the §1605(a)(6) arbitration exception).[16] The consensus among national courts and international arbitration scholars[17] is that denials of annulment applications have no preclusive effect on national courts in other jurisdictions in enforcement actions on the same award. The Opp. 7-8 is flat wrong when it suggests international practice is otherwise. *See,* e.g., *Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657, 661-62 (2d Cir. 2005) (declining to follow Egyptian court decisions confirming award on annulment application); *VRG Linhas Aereas S/A v. MatlinPatterson Global Opportunities Partners II L.P.*, 605 F. App'x 59, 60-61 (2d Cir. 2015) (citing *Sarhank* and declining to follow a Brazilian court decision rejecting "set aside"). This position is adopted by the courts of Belgium, Luxembourg, Germany, and other nations,[18] including, notably, France. *See* Bensaude Dec., ¶¶28-31, 54 (citing French Supreme Court cases, DB Ex. 4, 5, and 6).

***Fourth,*** there is no FSIA exception allowing recognition of foreign judgments against a sovereign. It would be illogical to apply issue preclusion to a foreign judgment that cannot be recognized under FSIA without an express waiver. As *Firebird Global Master Fund II Ltd. v.*

---

[16] Compare FSIA §1605(a)(6) ("*an agreement* made by the foreign state with or for the benefit of a private party *to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration…*") with New York Convention, Art. II(1) ("*an agreement* in writing under which the parties undertake *to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration…*").

[17] *See* Gary Born, *International Commercial Arbitration* § 27.02 (3d ed. 2021) (Ex. 15).

[18] *See,* e.g., *Diag Human SE v. Czech Republic*, Brussels Court of Appeal, 2016/AR/1596 (Nov. 12, 2019) (refusing to rely on foreign judgments from other enforcement proceedings) (Ex. 16); *Diag Human SE v. Czech Republic*, Luxembourg District Court, Civil Judgment 2019TALCH10/00094 (June 7, 2019) (same) (Ex. 17); *Deutsche Telekom AG v. India*, Berlin Higher Regional Court, 12 Sch 7/21, Judgment (Jan. 26, 2023) (finding the court was not bound by the decision of a foreign court rejecting a "set aside" application) (Ex. 18).

*Republic of Nauru*, 915 F.Supp.2d 124, 126-27 (D.D.C. 2013) held, waivers of sovereign immunity are "narrowly construed in favor of the sovereign and are not enlarged beyond what the language requires." *Firebird* refused to recognize a Japanese judgment, finding no exception under FSIA where Nauru had expressed consent to jurisdiction of only Japan's and its own home courts. *Id.* at 126-127. *See also Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp.*, 143 F.4th 496, 499 (D.C. Cir. 2025) (finding FSIA arbitration and waiver exceptions inapplicable to recognize a foreign court judgment confirming an arbitral award: "Applying either exception here would require us to conflate two distinct concepts – arbitral awards and foreign court judgments. … Because neither exception applies, we lack subject matter jurisdiction …"). Russia never consented to the jurisdiction of U.S. courts for purposes of recognizing a French judgment in an action for annulment in France. Its non-participation in the arbitration and challenging the award in French courts cannot be transformed into an express waiver of recognition of a French judgment, particularly when it did not choose France as the seat of arbitration. Without recognition, the French Decision cannot have preclusive effect.

### B.   *Hilton* Comity Counsels Against Recognizing The French Decision (Opp. 6-7)

Recognition of foreign judgments in the United States rests on the principle of international comity. As further guidance, *Hulley* directed the District Court to "apply the *Hilton* factors to determine whether principles of comity counsel in favor of recognizing the [foreign] judgments." 149 F.4th at 692 (citing *Hilton v. Guyot,* 159 U.S. 113 (1895)).

*First,* one *Hilton* factor counseling against recognition is the principle of reciprocity: "[T]here is a distinct and independent ground upon which we are satisfied that the comity of our nation does not require us to give conclusive effect to the judgments of the courts of France; and that ground is, the want of reciprocity, on the part of France, as to the effect to be given to the judgments of this and other foreign countries." *Hilton*, 159 U.S. at 210. While *Laker Airways,*

*Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 939-40 (D.C. Cir. 1984) noted that "reciprocity may no longer be an absolute requirement," it refused comity to a UK injunction designed to interfere with plaintiff's U.S. suit.[19]  The Court noted that the use of the foreign judicial action was "purely *offensive* – it [was] not designed to protect English jurisdiction [but] only to quash the practical power of the United States courts to adjudicate claims under United States law." *Id.*, 838 (emphasis in original).  Here, too, Oschadbank seeks to use the French Decision offensively to prevent this Court from independently determining a core FSIA jurisdictional issue.  French courts, in actions for enforcement of international arbitral awards issued outside of France, determine the existence, validity and scope of arbitration agreement *de novo*, without deference to judicial decisions on the same award made in other jurisdictions, including the seat of arbitration.  *See* Bensaude Dec., ¶¶28-31, 54 (citing French Supreme Court precedent).  Under *Hilton*, this Court should not accord comity to the French Decision because French courts would not extend comity to this Court's judgment under similar circumstances.

**Second,** another *Hilton* factor counseling against recognition is the existence of a "special reason why the comity of this nation should not allow it full effect."  *Id.*, 159 U.S. at 202.  One "special reason" is that multiple national courts deciding the same issues differently.  For example, the French Decision concluded that Oschadbank's investments made prior to January 1, 1992 was not a jurisdictional issue, contrary to Article 12.  *See* French Decision, ¶¶36-42.  In contrast, the Netherlands Supreme Court in an annulment action  of a different award against Russia regarding another Crimean claimant held that Article 12 is a jurisdictional limitation.  *See The Russian Federation v. NJSC Naftogaz of Ukraine et al.*, No. 22/03902, Judgment, 6 December 2024 (Ex. 19), ¶¶4.4.1-4.4.3.  Under comity, it would be unfair to recognize one foreign decision where

---

[19] *See Banco Nacional De Cuba v. Sabbatino*, 376 U.S. 398, 411 (1964) (interpreting *Hilton* as "impos[ing] the requirement of reciprocity only in regard to conclusiveness of judgments"), *abrogated on other grounds*.

another reaches the opposite conclusion on the same issue, particularly when immunity is at stake.

### C. Oschadbank Fails to Establish The French Law Of Collateral Estoppel

Aside from jurisdiction, Oschadbank fails to establish the grounds for issue preclusion.

*First,* issue preclusion based upon foreign decisions is only available when the originating jurisdiction recognizes the doctrine.  *See*, e.g., *Weiss v. LaSuisse*, 293 F.Supp.2d 397, 405 (S.D.N.Y. 2003) ("Because Switzerland does not recognize the doctrine of collateral estoppel, [this court] cannot apply the doctrine to bar this aspect of [party's] claims."); *Alfa Consult SA v. TCI Int'l, Inc.*, 2023 U.S. Dist. LEXIS 178309, *17 (N.D. Cal. 2023) ("an international judgment will not have a preclusive effect … unless it would also have preclusive effect under the foreign country's laws").  The Opp. does not discuss – let alone dispute – this requirement.

*Second,* "[t]he party invoking collateral estoppel bears the burden of establishing that its conditions have been satisfied." *Aenergy, S.A. v. Republic of Angola*, 123 F.4th 1351, 1356 (D.C. Cir. 2024).  The party seeking to apply foreign law also "bears the burden of establishing the substance of that foreign law." *McKesson Corp. v. Islamic Republic of Iran*, 753 F.3d 239, 243 (D.C. Cir. 2014).  The Opp. 4-8 makes no attempt to demonstrate the French Decision carries issue preclusive effect in France.  Conversely, U.S. courts recognize issue preclusion as one of the differences between common law and civil law systems, observing that "collateral estoppel as such does not appear to be recognized in the civil law."  *Bata v. Bata*, 163 A.2d 493, 506 (Del. 1960) ("Switzerland does not recognize the rule of collateral estoppel[.]").  *See also Gordon and Breach Science Publishers S.A. v. Am. Institute of Physics*, 905 F. Supp. 169, 179 (S.D.N.Y. 1995) ("[N]either Switzerland nor Germany recognize the doctrine of collateral estoppel[.]"). The Opp. cites no authority the French civil law system recognizes issue preclusion at all, or that its elements are met. This failure is fatal.  *See*, e.g., *Estate of Botvin v. Islamic Republic of Iran*, 772 F.Supp.2d 218, 231 (D.D.C. 2011) ("court is not obligated to remedy deficiencies in the presentation of

foreign law offered by the plaintiffs") (citing Fed. R. Civ. P. 44.1).

### D. French Law Has No Issue Preclusion Effect Applicable To This Case

Even if French law permitted issue preclusion, it has no effect here.

*First,* as set forth in the accompanying declaration of French law expert Denis Bensaude, based on the French Code of Civil Procedure ("CPC") and judicial decisions, French courts do not recognize the doctrine of issue preclusion.  Bensaude Dec., ¶¶ 9, 52-53.  That should end it.

*Second*, only the so-called "dispositive section" of a French court decision has "*autorité de la chose jugée,*" akin to *res judicata* (claims preclusion), and only with respect to the dispute it decides.  *Id.*, ¶¶ 41-43 (citing CPC Articles 1335 and 480).[20]  This preclusive effect in subsequent proceedings between the same parties is limited to the "dispositive section" only.  *Id.*, ¶¶ 10, 44-47 (citing CPC Articles 480 and 4, and Cass. ass. plen. 13 March 2009, No. 08-16033 (landmark French Supreme Court case on the subject), DB Ex. 8).  This preclusive effect of the dispositive part does not extend to any factual findings or legal conclusions found outside of the dispositive part, such as in the reasoning part of a French court decision.  *Id.*, ¶¶ 44-45, 49-52 (citing CPC Articles 480 and 4).  The "dispositive section" of the French Decision is limited to paragraphs denying the annulment petition, which have "*autorité de la chose jugée*" (i.e., is *res judicata*).  *Id.* ¶¶35, 48; French Decision, 26.  The French Decision's *res judicata* effect is limited to France, and to the content of its dispositive section.  *Id.*, ¶¶ 10, 49-51, 55-56 (citing Cass. civ. 1, 29 June 2007, No. 06-13293, DB Ex. 9).  The dispositive part of the French Decision contains no factual or legal findings (only the holding).  *Id.*, ¶¶ 35, 39; French Decision, 26.  The only *res judicata* (preclusive)

---

[20] "Article 1355 [CPC] defines claim preclusion as "*autorité de chose jugée*" (often translated into English as *res judicata*) … For *res judicata* to apply to a French court decision under French procedural law, there is thus a triple prerequisite: the claim to be adjudicated by the French court decision must be the same as in the prior French proceeding, this claim must have been made among the same parties acting under the same capacity, and this claim must have been made based on the same ground (or plea)." *Id.* ¶¶ 42-43.

effect of this decision under French law is to bar new proceedings to annul the award in France. *Id*. ¶¶ 51, 55-56.  Accordingly, Russia is not precluded from demonstrating that it never agreed to arbitrate the dispute under the BIT.  *Id*. ¶¶55-56.

### E. Preclusion Does Not Apply Because the Issues Are Different Under FSIA and French Law (Opp. 4-8)

Issue preclusion does not apply because it requires: (1) "the same issue … must have been contested … and submitted for judicial determination"; (2) "the issue must have been actually and necessarily determined"; and (3) "preclusion … must not work a basic unfairness." *Aenergy, S.A.*, 123 F.4th at 1356.  Oschadbank has not met its "burden of establishing that [these] conditions have been satisfied." *Id.*

*First*, unrelated to FSIA jurisdiction, the French Decision applied the "common intent to arbitrate" standard under French international arbitration law in its determination the BIT applies to the "investments." Bensaude Dec. ¶¶57-58, Conclusions 4 at 20.  The French Court did not, and could not, consider how U.S. courts interpret the law of IAC or FSIA.

*Second*, under U.S. law, this Court will not look to French international arbitration law, but will determine jurisdiction by interpreting the BIT under U.S. law, which includes looking to the VCLT, and under it, international law. *See,* e.g*., Sullivan v. Kidd*, 254 U.S. 433, 439 (1921) ("treaties are to be interpreted upon the principles which govern the interpretation of contracts in writing between individuals"); *United States v. Ali*, 718 F.3d 929, 938 (D.C. Cir. 2013) (citing VCLT as authority on "[b]asic principles of treaty interpretation"); Nouvel Dec., (ECF 40), §§ 21, 44-48, 50-55, 91-115, 120-124.  This Court will further look to the law of IAC, as interpreted by U.S. courts and the United States, as well as other authorities.  *See*, e.g., *de Csepel, supra; Caltex, supra*; *Juragua, supra*; DoD Manual, §18.16.4; and VS Dec. (ECF 78), ¶¶85-89 (citing, inter alia, Ukrainian scholar confirming international law on foreign investments does not apply during and

IAC).  Under the VCLT, this Court will also look to historical Russian and Ukrainian law in its independent evaluation of the validity of the BIT's agreement to arbitrate.  *See* VS Dec., §§ 31-65. This is completely different than the law France applies.

      *Third*, "[i]dentity of the issue is established by showing that the same general legal rules govern both cases."  *Aenergy, S.A.,* 123 F.4th at 1356.  Here, the French Decision applied the "common intent to arbitrate" standard under French international arbitration law.  Bensaude Dec. ¶¶57-58, Conclusions 4 at 20.  Moreover, the Opp. 4, 5 twice conceded the French Decision was limited to "whether *the Tribunal* had jurisdiction."  In contrast, this Court will apply U.S. law, and under U.S. law, look to the VCLT and customary international law, the law of IAC and Russian and Ukrainian historical law, to determine if *this Court* has jurisdiction.[21]  *Chum Ltd. v. Lisowski*, 2001 U.S. Dist. LEXIS 2462 (S.D.N.Y. Mar. 12, 2001) refused to give collateral estoppel effect to "the findings of the Paris Court of Appeals [that] were predicated on French legal standards" because "Defendants have provided no evidence that the legal standards governing [the subject matter claims] in France are identical to any of the legal standards governing the myriad claims in this case."  Here, Oschadbank has made no showing that French international arbitration law is identical to U.S. law because it isn't.[22]

## CONCLUSION

      For the above reasons, the Court should dismiss the Petition for lack of FSIA jurisdiction.

---

[21] The Opp. 6-8 argues the French Decision is issue preclusion in that the "Tribunal had jurisdiction to issue the Award."  However, the Tribunal's jurisdiction is not the same as this Court's jurisdiction.  Contrary to Oschadbank, *Ins. Corp. of Ir. v. Compagnie Des Bauxites De Guinee*, 456 U.S. 694 (1982) is inapposite because FSIA jurisdiction was never litigated in France under the same law applied in the U.S.  *TIG Ins. Co. v. Republic of Arg.*, 110 F.4th 221 (D.C. Cir. 2024) does not go beyond stating that contract law may "inform our understanding" of an agreement, which is irrelevant to whether the BIT was legally superseded. Further, *Termorio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928 (D.C. Cir. 2007) did not involve issue preclusion.

[22] *See also Cuno, Inc. v. Pall Corp.*, 729 F.Supp. 234, 239 (E.D.N.Y. 1989) (no collateral estoppel based on a prior UK court decision because patent law differed between the UK and the U.S.).

Dated: October 20, 2025

MARKS & SOKOLOV, LLC

*/s/ Bruce Marks*
Bruce S. Marks (Bar I.D. CO0034)
Thomas Sullivan (Bar. I.D. PA0122)
Maria Grechishkina (Bar I.D. PA0119)
1835 Market St., 17th Floor
Philadelphia, PA 19103
Tel. (215) 569-8901
marks@mslegal.com
tsullivan@mslegal.com
mgrechishkina@mslegal.com

31

## CERTIFICATE OF SERVICE

I certify that on October 20, 2025 the foregoing document was filed electronically and served upon all counsel of record via the Court's CM/ECF filing system in accordance with the Federal Rules of Civil Procedure.

Dated: October 20, 2025

MARKS & SOKOLOV, LLC

*/s/ Bruce S. Marks*
Bruce S. Marks (D.C. Bar No. CO0034)
1835 Market St., 17th Floor
Philadelphia, PA 19103
Tel. (215) 569-8901
Fax (215) 569-8912
marks@mslegal.com

*Counsel for Respondent,*
*The Russian Federation*